# Ben Avon Boro. et al., Appellants, *v.* Ohio Valley Water Company (No. 1).

*Public Service Commission—Administrative functions—Discretion—When orders are final—Jurisdiction of courts to review—Reasonableness of orders—Prima facie evidence—Burden of proof—Acts of July 26, 1913, P. L. 1374, and June 3, 1915, P. L. 779.*

1. On an appeal from an order of the Public Service Commission fixing a schedule of rates to be charged by a public service company under the Act of July 26, 1913, P. L. 1374, the inquiry by the court is not whether the order is such as the court would have made in the exercise of administrative functions, but whether it was a reasonable exercise of the discretion conferred upon the commission by the statute; in other words, the court is not to substitute its judgment as to rates or values for that of the commission.

2. It is not intended that the courts shall interfere with the commission to review its determinations further than is necessary to keep them within the law, and protect the constitutional rights of the corporations over which it is given control.

3. The settled rule seems to be, that the orders of the commission are to be accepted as final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power; or (3) based on a mistake of law; and, where questions of fact are involved, an order, regular on its face may be set aside if it appears that (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the commission acted so arbitrarily and unjustly as to fix rates contrary to evidence or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance and not the shadow determines the validity of the exercise of the power. The wisdom or expediency of the order is not involved.

4. As the statute, in section 23, makes the orders of the commission prima facie evidence of the reasonableness thereof and specifies that the burden of proving the contrary shall be on the appellant, the function of the appellate court on this point is to decide whether or not the appellant has discharged the burden cast on him by the legislature.

*Appraisal of Public Service Company property for rate-making purposes—Basis of valuation—Cost of purchase or reproduction—Depreciation—Parallel and competing lines—Going concern value —Interest.*

5. In determining whether an order fixing a schedule of rates is reasonable and in conformity with law, the questions of a fair value of the property for rate-making purposes and the amount of revenue which the property owner is entitled to collect, are necessarily involved.

6. The ascertainment of the fair value of property for rate-making purposes, is not a matter of formulas, but calls for the exercise of a sound and reasonable judgment upon a proper consideration of all relevant facts; the commission may take into consideration various methods and use its judgment as to the extent to which either shall be employed.

7. In appraising the value of consolidated operating waterworks for rate-making purposes, the original cost of the property is not to be taken as controlling, for there may have been extravagance in the purchase, or bad management; and, on the other hand, there may have been an actual increase in values since the original purchase or construction.

8. So also the reproduction cost, less depreciation, may not give the present fair value of an old property, for it may not now be desirable to reproduce the old type of plant; improved machinery

and better methods of operation may have come into vogue which would make it true economy to relegate a large part of the physical structure of an old plant to the scrap heap.

9. When a proper allowance is made for the value of the physical property from an investment standpoint, with the business attached, the "going concern value" is necessarily included within that estimate, although it be not estimated as a separate item.

10. In determining cost of production as a basis for establishing a reasonable rate of charge, allowance for "going-value" usually rests on the theory that dividends should be postponed until the earnings are adequate to cover operating expenses, cost of securing new business and interest on bonds.

11. Where the property of a water company included a part of an island in the Ohio· river near Pittsburgh and an adjoining tract of wet land, largely sand bar, lying partly within and partly outside of the harbor lines established along the Ohio river for navigation purposes by the United States government, and wells were located on this sand bar, and there was some evidence that the ordinary water of the river was purified by being filtered through the sand bar, giving this land a special value; but there was also evidence that the water in the wells did not come from the ordinary channel of the river, and that its source was an underground stream, flowing through a bed of sand and gravel beneath the bed of the overchannel of the river, and that this · stream could be reached in that vicinity by putting down wells at any point on the island, which would tap the underground flow as effectively as did the wells located on the sand bar, the commission's valuation based on the latter evidence is not to be reversed by the court in reliance on the other evidence.

12. When a considerable part of the land occupied by the pumping station of the company, lay in the river outside of and below the harbor line, so that the company had merely a qualified right to the use of the land between high and low watermark, and its occupancy of that portion of the property was dependent upon the grace of the Federal government, such favor could not properly be made a basis for capitalization as against the public.

13. In fixing the value of certain parallel and competing lines purchased by a water company, where the evidence showed that the purchase was made for the purpose of getting rid of business competition, rather than to increase· the service capacity of the purchaser, the determination of what was · necessary and what was over development under the circumstances, was clearly within the proper function of the commission; and where, as here, the finding of the commission allowing one-third of the reproduction cost is

sustained by competent evidence, and no abuse of discretion is shown, the finding should not be disturbed by the court on review.

14. In fixing the amount to be allowed for interest during the period of construction of the plant, the commission allowed interest for a period of one and a half years, and as the plant was built to serve a number of communities and would naturally be ready for use in part at different times, so that under proper management the plant would be earning money on some of its divisions long before they were all entirely completed, it cannot be said that the report of the commission in this respect was unreasonable, or that it was not in conformity with law.

15. Brokerage should not be included in capitalization as a basis of permanent charge against the public.

Argued Jan. 7, 1918. Appeal, No. 17, Oct. T., 1918, by complainants, from decree of Superior Court, April T., 1917, No. 186, reversing orders of Public Service Commission complaints Nos. 335, 415, 416, 417, 496, 1915, in cases of Ben Avon Borough, McKees Rocks Borough, Bellevue Borough, Avalon Borough and Stowe Township and W. B. Dawson, v. Ohio Valley Water Company. Before BROWN, C. J., MESTREZAT, POTTER, STEWART, MOSCHZISKER, FRAZER and WALLING, JJ. Reversed.

Appeal from Superior Court.

The facts appear in Ben Avon Boro. et al. v. Ohio Valley Water Co., 68 Pa. Superior Ct. 561, and in the opinion of the Supreme Court.

The Superior Court reversed the order of the Public Service Commission. Plaintiffs appealed.

*Error assigned* was the decree of the Superior Court.

*David L. Starr* and *Albert G. Liddell,* with them *James McLaren* and *Leonard K. Guiler;* for appellants.—The Superior Court upon appeal from an order of the commission has no power to interfere with findings of fact made by the commission: Prentis v. Atlantic C. L. Co., 211 U. S. 210; Knoxville v. W. Co., 212 U. S. 1.

The findings of fact by the commission have the weight of the verdict of a jury and should not be set aside, if sup-

ported by evidence: Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U. S. 541; Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U. S. 88; Interstate Commerce Commission v. Illinois Central R. R. Co., 215 U. S. 452; Intermountain Rate Cases, 234 U. S. 490; Knoxville v. Knoxville Water Co., 212 U. S. 1; Minneapolis, St. P. & St. Ste. M. R. Co. v. Railroad Commission of Wisconsin, 136 Wis. 146; State v. Great Northern Ry. Co., 130 Minn. 57; Steenerson v. Great Northern Ry., 69 Minn. 353; People ex rel. New York and Queens Gas Co. v. McCall, 219 N. Y. 84; State v. Great Northern Ry. Co., 153 N. W. Re. 247; Pennsylvania R. R. Co. v. Pub. Ser. Com., 67 Pa. Superior Ct. 575; Buffalo & L. E. Trac. Co. v. Pub. Ser. Com., 67 Pa. Superior Ct. 581; Hamilton v. Hopkins, 247 Pa. 499; Commonwealth v. Westinghouse Elect. & Mfg. Co., 151 Pa. 265; Commonwealth v. Hulings, 129 Pa. 317; Brown, Early & Co. v. Susquehanna Boom Co., 109 Pa. 57; White, Appellant, v. Wright, 179 Pa. 75; Kelly v. Pittsburgh & B. Traction Co., 204 Pa. 623; Dutton's Est., 181 Pa. 426.

*Berne H. Evans,* with him *Francis Shunk Brown,* Attorney General, for Public Service Commission, appellant.—The proper method was followed by the commission in arriving at the fair value of the company's property: Fuhrmann v. Cataract Power & Conduit Co., 3 P. S. C. R. 2nd N. Y. 656; Queensboro Gas & Elec. Co., 2 P. S. C. R. 1st N. Y. 544; Appleton Water Works Co. v. Railroad Commission, 154 Wis. 121; Omaha v. Omaha Water Co., 218 U. S. 180; Newburyport Water Co. v. City of Newburyport, 168 Mass. 541; Application of Macon Ry. & Light Co., 29 A. T. & T. Leaflets 1085; City of Ely v. Ely Light & Power Co., 24 A. T. & T. Leaflets 590; Valuation of Exchange in Spokane, 25 A. T. & T. Leaflets 900; Berlin Electric Light Co., 3 New Hampshire P. S. C. 174; Pine Lawn v. W. St. Louis Water Co., P. U. R. 1917 B. 679; Cumberland Tel. &

294 BENAVONBORO. et al., Appel., *v.* OHIO V. W. CO. (No. 1).

Arguments—Opinion of the Court.    [260 Pa.

Tel. Co. v. City of Louisville, 187 Fed. 637; Duluth St. Ry. Co. v. R. R. Com., P. U. R. 1915 D. 192; State Journal Ptg. Co. v. Madison Gas & Elec. Co., 4 Wis. R. C. Rep. 501; Missouri Rate Cases, 230 U. S. 474; City of Milwaukee v. The Milwaukee E. Ry. & L. Co., 11 Wis. R. C. Rep. 338.

The Superior Court acted on the theory that it was to substitute its opinion of reasonableness for that of the commission.

*William Watson Smith,* with him *Gordon & Smith,* for appellee.—The broadest powers are vested in the appellate courts upon an appeal from an order of the Public Service Commission: Mt. Union Boro. v. Mt. Union Water Co., 63 Pa. Superior Ct. 337.

The Superior Court had jurisdiction to make the order complained of.

OPINION BY MR. JUSTICE POTTER, February 25, 1918:
This is an appeal from the judgment of the Superior Court, reversing an order of the Public Service Commission, in which it fixed a schedule of rates to be charged by the Ohio Valley Water Company, based upon the fair value of the property of the company as ascertained by the commission. The Superior Court directed the commission to reform its valuation in certain definite particulars, and upon that valuation to fix a schedule of rates which would cover expenses and depreciation, and would yield a return found by the commission to be fair. Alleging that the effect of the decree of the Superior Court was merely to substitute its opinion as to the value of certain items of property for that of the commission, and that it left to the commission no duty other than that of making the computations as directed, the commission and the parties complainant before it, have taken this appeal.

The authority of the Superior Court to review the findings of the commission is found in the Act of July 26,

1913, P. L. 1374, as amended by the Act of June 3, 1915, P. L. 779, which provides that appeals shall be taken to the Superior Court, instead of to the Court of Common Pleas of Dauphin County.   In the Act of July 26, 1913, P. L. 1374-1427, it is provided, inter alia, as follows:

"Section 22. At the hearing of the appeal the said court shall, upon the record certified to it by the commission, determine whether or not the order appealed from is reasonable and in conformity with law.

"Section 23.   In all such cases the orders of the commission shall be prima facie evidence of the reasonableness thereof, and the burden of proving the contrary shall be upon the appellant or appellants; and the notes of testimony taken before the commission or any of the members thereof, duly certified under its seal, and filed as aforesaid as a part of the record, shall be considered by the court as the testimony in the case.

"Section 24. If the court shall, upon the record, find that the order appealed from is reasonable and in conformity with law, it shall enter a decree dismissing the appeal and affirming the order of the commission.   If the court shall, upon the record, find that the order appealed from is unreasonable or based upon incompetent evidence materially affecting the determination or order of the commission, or is otherwise not in conformity with law, it may enter a final decree reversing the order of the commission, or, in its discretion, it may remand the record to the commission, with directions to reconsider the matter and make such order as shall be reasonable and in conformity with law.   In case the said court shall reverse an order of the commission dismissing a complaint, after an investigation and hearing thereon before the commission, it shall remand the record and proceedings to the commission, with directions to reinstate the complaint, proceed to another hearing and investigation, and make such order as shall be reasonable and in conformity with law.   In making any final decree on any appeal the court shall have full power to dispose of all costs."

296 BENAVON BORO. et al., Appel., *v.* OHIO V. W. CO. (No. 1).

Opinion of the Court.                    [260 Pa.

In the case of Mt. Union Boro. v. Mt. Union Water Company, 63 Pa. Superior Ct. 337, the Superior Court defined its functions in dealing with appeals from the orders of the Public Service Commission. It there said (p. 341) : "By the Act of 1915 the legislature saw fit to amend certain sections of the Act of 1913 so as, inter alia, to make the appeal allowed by the last named act to this court instead of the Court of Common Pleas of Dauphin County. Section 22, of the Act of 1913, just quoted, was neither amended nor repealed. It still measures the scope and purpose of our revisory powers, so far as conferred by this act, as it did those of the court of Dauphin County. There is nothing in the Act of 1915 to warrant the conclusion that the legislature intended to make the Superior Court a second administrative commission. The statute neither requires nor authorizes this court to fix and determine for itself the rate, charge, etc., that a public service company may exact. Our function is, as the statute declares, but to decide whether or not the appellant has discharged the burden cast on him by the legislature. Or in the words of the act our inquiry, therefore, must be, was the order appealed from, as shown by the record certified to us by the commission, 'reasonable and in conformity with law'?" And in B. & O. R. R. Co. v. Public Service Commission, 66 Pa. Superior Ct. 403, the Superior Court again said (p. 412) : "Establishing a schedule of the rates or tolls that a public service company may lawfully demand is one of the most complicated and important of all the many important tasks imposed by the legislature on the Public Service Commission. The proper determination of such questions necessarily involves the consideration of many matters and things far removed from the atmosphere of an appellate court of law."

This concise interpretation of our statute, defining the function of the court in dealing with appeals from the orders of the Public Service Commission, is in accord with the general principle announced in the decisions of

the Supreme Court of the United States dealing with appeals from the orders of the Interstate Commerce Commission, and it is also in harmony with the decisions of the Supreme Courts of various states, dealing with appeals from the orders of Public Service Commissions. Thus, in Interstate Commerce Commission v. Illinois Central Railroad, 215 U. S. 452, 470, the Supreme Court of the United States pointed out that the court may not, "under the guise of exerting judicial power, usurp merely administrative functions by setting aside a lawful administrative order upon our conception as to whether the administrative power has been wisely exercised. Power to make the order and not the mere expediency or wisdom of having made it, is the question." And in Interstate Commerce Commission v. Union Pacific R. R., 222 U. S. 541, the same court said (p. 547) : "There has been no attempt to make an exhaustive statement of the principle involved, but, in cases thus far decided, it has been settled that the orders of the commission are final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law. But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if it appears that (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power. [Citing cases.] In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the commission acted within its power. It will not consider the expediency or wisdom of the order, or

whether, on like testimony, it would have made a similar ruling. 'The findings of the commission are made by law prima facie true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience': Ill. Cent. v. I. C. C., 206 U. S. 441. Its conclusion, of course, is subject to review, but when supported by evidence is accepted as final; not that its decision, involving as it does so many and such vast public interests, can be supported by a mere scintilla of proof—but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order." The Supreme Court of Minnesota, dealing with the same question, in State v. Great Northern R. R., 130 Minn. 57, tersely said (p. 59) : "The principle on which the court acts in determining whether or not an order of the commission is reasonable, has been the subject of much controversy, but the law upon the subject is now well settled. The legislature never intended that the court should put itself in the place of the commission and try the matter anew as an administrative body, substituting its findings for those of the commission.......The courts must not usurp legislative or administrative functions by setting aside a legislative or administrative order on their own conception of its wisdom."

One of the latest decisions in which was considered the question of the proper exercise of jurisdiction by an appellate court, in a case similar to the present, is that of People ex rel. N. Y. & Queens Gas Co. v. McCall et al. Public Service Commission, 219 N. Y. 84. It was there said (page 87) : "The court has no power to substitute its own judgment of what is reasonable in place of the determination of the Public Service Commission, and it can only annul the order of the commission for the violation of some rule of law. The Public Service Commissions were created by the legislature to perform very important functions in the community, namely, to regulate the great public corporations of the state in the conduct

of their business and compel those corporations adequately to discharge their duties to the public and not to exact therefor excessive charges. It was assumed perhaps by the legislature that the members of the Public Service Commissions would acquire special knowledge of the matters intrusted to them, by experience and study, and that when the plan of their creation was fully developed they would prove efficient instrumentalities for dealing with the complex problems presented by the activities of these great corporations. It was not intended that the courts should interfere with the commissions or review their determinations further than is necessary to keep them within the law and protect the constitutional rights of the corporations over which they were given control."

In that case the gas company contended that the effect of the decision would be to require an expenditure of money upon which the prospective earnings would not provide an adequate return, and that the company would thereby be deprived of property without due process of law, and, upon that ground, the gas company appealed to the Supreme Court of the United States. That court held (Supreme Court Rep., Vol. 38, p. 122), That no federal constitutional right had been denied to the gas company, and said that the definition of the power of the state court to review the decision of the Public Service Commission differed "but slightly, if at all, from the definition by this court of its own power to review the decisions of similar administrative bodies." And in concluding the opinion it was further said (p. 124) : "These administrative commissions, with large powers, are called into existence, with an organization and with duties which peculiarly fit them for dealing with problems such as this case presents, and we agree with the Court of Appeals of New York, in concluding that the action of the commission complained of, was not arbitrary or capricious, but was based on very substantial evidence, and therefore that, even if the courts differed with

300 BEN AVON BORO. et al., Appel., *v.* OHIO V. W. CO. (No. 1).

Opinion of the Court. [260 Pa.

the commission as to the expediency or wisdom of the order, they are without authority to substitute for its judgment their views of what may be reasonable and wise."

It is, therefore, to be regarded as a settled principle that, under such legislation as that with which we are here dealing, in an appeal from an order of the Public Service Commission, the inquiry by the court is not, whether the order is such as the court would have made in the exercise of administrative functions, but whether the order was a reasonable exercise of the discretion conferred upon the commission by the statute. In other words, the court is not to substitute its judgment as to rates or values, for that of the commission.

In the present case, the appellants contend that the action of the Superior Court in reversing the order of the Commission was in effect merely the substitution of its judgment as to values, for that of the commission. Taking up the consideration of that contention, we find from the record that, in 1904, the Ohio Valley Water Company purchased the property and franchises of the Valley Consolidated, the Perryville, and the Fleming Park, Water Companies. In May, 1913, the Ohio Valley Water Company also purchased a controlling interest in the capital stock of the Monongahela Water Company, and later acquired the property of that company. On December 30, 1913, the Ohio Valley Water Company adopted a schedule of rates for the supply of water within the district it served, and filed the schedule with the Public Service Commission. In December, 1914, complaints were filed with the commission on behalf of the Boroughs of Ben Avon, McKees Rocks, Bellevue, Avalon, and West View, and by the authorities of Stowe Township, and by W. B. Dawson, as an individual, alleging that the rates of the Ohio Valley Water Company were unreasonable, excessive and unjust. These complaints were consolidated, and public hearings held thereon, by the Public Service Commission, and, after careful investi-

gation and full consideration, the commission, on February 12, 1917, filed its report containing its findings of fact and conclusions thereon, with a finding as to the fair value of the property of the water company as used and useful in the public service; and the commission thereupon issued an order fixing a rate schedule, which, in its judgment, would yield to the respondent a just and reasonable return upon the fair valuation of its property. From this report and order, the Ohio Valley Water Company appealed to the Superior Court, and the Public Service Commission became a party appellee, and the various parties interested intervened as additional appellees. The appeal presented for determination the question whether the order appealed from was reasonable and in conformity with law, and in this inquiry was involved the question of the fair value, for rate making purposes, of the property of appellant, and the amount of revenue which appellant was entitled to collect.

In its decision upon the appeal, the Superior Court differed from the commission as to the proper valuation to be placed upon several items going to make up the fair value of the property of the water company for rate making purposes. One of these items was with respect to the value of what is known as the Neville Island property, upon which the company located its pumping station and several of its wells. The location is at the head of Neville Island in the Ohio river, the property including about nine acres in all, two of which are dry land and seven acres are wet land, largely sand bar, lying partly within, and partly outside of, the harbor lines established along the Ohio river, for navigation purposes by the United States government. On the seven-acre tract the company located its wells, putting them down through the sand bar to an underflow of pure water below it. The evidence shows that the land in question was purchased by the company in 1904, for the sum of $3,900. Witnesses for complainants, familiar with land values in that vicinity, valued the land for general pur-

302 BENAVONBORO. et al., Appel., *v.* OHIO V. W. CO. (No.1).

Opinion of the Court.                    [260 Pa.

poses, and without reference to its particular use as a site for a pumping station, at various sums, averaging about $8,200. The commission, however, seems to have assented to the contention that some special value attaches to the location as a site for a pumping station, and as a source of water supply; and for rate making purposes it estimated the reproduction cost of the Neville Island property at the sum of $48,800. The Superior Court differed from the commission as to this estimate of value, and directed the commission to increase the amount, intimating that it should be fixed at a sum not less than $100,000. The action of the court was evidently based upon an acceptance of the contention of the company that the water furnished by it was the ordinary water of the Ohio river, but purified by being filtered through the sand bar upon which the wells were located; and that the sand bar was, therefore, of special and peculiar value as a means of producing filtered water, not readily obtainable in that vicinity, except through the use of the sand bar. There was much evidence of high character, however, before the commission, tending to show that the theory upon which this contention was founded was not correct; and that the water in the wells did not come from the ordinary channel of the river, but that its source was an underground stream, flowing through a bed of sand and gravel beneath the bed of the overchannel of the Ohio river, and that this stream could be reached in that vicinity by putting down wells at any point on Neville Island, which would tap the underground flow as effectively as did the wells which the plaintiff company located on the sand bar at the head of the island. Mr. Hice, the State geologist, of Pennsylvania, gave testimony tending to show that, as a result of glacial action in the Ohio Valley, the rock floor of the river bed is overlaid with a deposit of sand and gravel, some thirty feet or more in depth, through which there is a true underground stream, of slow but continuous flow, and from which large quantities of water of excel-

lent quality can be obtained. He said that generally this water is under some pressure, and that, as a rule, wells driven down to this lower water, will flow, sometimes having a head of several feet, above the ordinary river stage. He gave the origin of this underground flow as being in part a seepage from the rocks at the sides, and in part from the upper portions of the streams at various places. He testified that the flow in the over-channel of the river carries silt and fine mud, part of which is deposited on the bottom, making it almost impervious; so that, from the overchannel, the penetration of water into the underlying gravel is very slow. In the opinion of the witness, wells located on Neville Island would reach the underground stream as readily as if they were located in the river, and, in so far as obtaining a supply of pure water was concerned, no advantage was obtained by drilling wells through the sand bar at the head of the island, over those drilled upon other parts of the island. Mr. Hice further said that the conditions at Neville Island in this respect were essentially the same as those which prevailed along the Ohio river from East Liverpool, Ohio, up, and he mentioned a number of towns on the river, where the water supply was obtained by wells from the same underground source. The place at which this underground or under-river supply of water was first utilized, within the knowledge of the witness, was at the old town of Economy, now the site of the town of Ambridge. This testimony of the State geologist was followed by that of Mr. Leaf, an engineer, who had actually constructed eight or nine water plants for Ohio river towns, drawing their water supply from this same underflow. Other practical men, speaking from experience, testified that water of the same quality as that furnished by the Ohio Valley Water Company could be obtained at other points on Neville Island, and in the vicinity of the plant of the Ohio Valley Water Company. If the commission credited the testimony of this nature which was presented, it would beyond question have been

304 BENAVONBORO. et al., Appel., *v.* OHIO V. W. CO. (No. 1).

Opinion of the Court.                    [260 Pa.

warranted in finding, from the evidence, that the sand bar upon which the water company located its wells had no special value as a source of water supply over other land in the vicinity. .

We think the Superior Court also erred, when, in estimating the value of the property, it refused to take into consideration the fact, shown by the evidence before the commission, that a considerable part of the land, occupied by the company at that point, lay in the river outside of and below the harbor line, so that the company had no absolute title to that portion of the property. Its absolute title ceased at high water mark. It had merely a qualified right to the use of the land between high and low water mark, and its occupancy of that portion of the property which lay below high water mark, in a navigable river, was dependent upon the grace of the government, and, such favor could not justly or properly be made the basis for capitalization, as against the public. The commission had before it testimony as to the actual cost of the Neville Island property, and as we have pointed out, there was ample evidence which, if credited by it, tended to show that a supply of similar water could be obtained by putting down wells at almost any point within a considerable area of other property in the vicinity. There was much more testimony which the commission took into consideration, in fixing the fair value of that portion of the property for rate making purposes, and it does not appear that any element properly entering into the value of the Neville Island property was overlooked by the commission, or that its finding in this respect was unreasonable or was based on incompetent evidence, and we can see no sound reason for interfering with its judgment in this respect.

Another item in which the judgment of the Superior Court differed from that of the commission, was as to the value of certain parallel lines of the Monongahela Water Company, a competing company, which was purchased by the Ohio Valley Water Company. After considering

much testimony, the commission decided that these parallel lines were useful in the public service only to the extent of one-third of their capacity, and, therefore, it allowed one-third of the engineer's estimates of the reproduction cost, new, of these lines. The Superior Court directed the commission to allow the entire reproduction cost new. The extent to which these lines were useful for the public service, and the value of the lines, were clearly questions of fact which were peculiarly within the jurisdiction of the commission to determine. The testimony shows that the purchase of these lines was made for the purpose of getting rid of business competition rather than to increase the service capacity of the purchaser. The determination of what was necessary, and what was overdevelopment under the circumstances, was clearly within the proper function of the commission, and where, as here, the finding is sustained by competent evidence, and no abuse of discretion is shown, the finding should not be disturbed by the court on review.

Another question as to which the Superior Court differed from the judgment of the commission, was as to the method of making allowance for what is known as "going concern value." The Superior Court held that this value should have been estimated as a separate item, and that the lowest amount named by the witnesses for the company would not be excessive for this item. One of the witnesses estimated the "going value" in a lump sum of $225,000, and another placed it at $185,000. Neither of them gave any convincing reason for naming these particular amounts. Mr. Chester, one of the witnesses for the company, defined "going value" as the difference between what he termed the bare bones of the plant, and those bones as developed into a prosperous and growing business. In other words, he regarded it as the cost of attaching the business to the plant. The record shows, however, that in making its estimate the commission in no sense confined itself to the bare bones of the plant, but on the contrary, took it as fully clothed with all the

attributes of an established business. In arriving at its estimate of the value of the property, the commission considered it as a going, operating concern, rendering successful service to the community, and being well patronized. In fixing the fair value for rate making purposes the commission took into consideration the conditions existing at the time the company was started, as well as at the present time, noting the difference in population, cost of materials, etc. It endeavored to arrive at an amount, which, under all the circumstances, was a fair basis for determining the reasonableness of the rates charged. No definite amount was put down as representing "going cost," but that element was taken into consideration in arriving at the fair value. The mere physical value of such a plant, considered apart from the fact that it is a going concern, would be only its scrap value. So that when a proper allowance is made for the value of the physical property from an investment standpoint, with the business attached, the going concern value is necessarily included within that estimate. This question of an allowance for going value has nowhere been more carefully dealt with than by the Wisconsin commission. The Supreme Court of Wisconsin in Appleton Water Works Company v. Railroad Commission, 154 Wisconsin 121, said (p. 148) : "The fundamental difficulty with the attempt to set a definite sum as the measure of 'going value' is that it is an attempt to divide a thing which is in its nature practically indivisible. The value of the plant and business is an indivisible gross amount. It is not obtained by adding up a number of separate items, but by taking a comprehensive view of each and all of the elements of property, tangible and intangible, including property rights, and considering them all not as a separate thing, but as inseparable parts of one harmonious entity and exercising the judgment as to the value of that entity. In this way the going value goes into the final result, but it would be difficult for even an expert to say how many dollars of the result

represent it." Our own case of Turtle Creek Borough v. Water Company, 243 Pa. 401, is authority for the proposition that in a rate case it is proper not to fix a separate and distinct sum for going value. It was there said (p. 413) : "As to the items of 'going value,' interest during the period of construction, and the cost of repairing the streets, which appellant contends were not allowed, or at least that there were no distinct findings as to these items, we agree that these were elements to be considered in arriving at a just valuation of the properties, but we cannot agree that it was the duty of the court to set out in its findings each separate item of value and make the sum total of the separate items the final conclusion of the court as to the valuation of the entire plant. In the opinion of the court in banc on the exceptions to findings of fact and conclusions of law, it is stated that these items were not eliminated by the trial judge in fixing the valuation, but that they were given due consideration. It is further stated that the trial judge did consider 'going value' as an element in fixing the value of the plant as a whole." In determining cost of production as a basis for establishing a reasonable rate of charge, any allowance for going value usually rests upon the theory that dividends should be postponed until the earnings are adequate to cover operating expenses, cost of securing new business, and interest upon bonds. In the present case no claim is made that the stockholders suffered by reason of dividends being unduly deferred while the business was built up. In fact it does not appear from the record that any money was put into the business by the stockholders. The record seems to indicate that all the property now owned by the company has been procured by the issue of bonds, or from income derived from operation.

We do not find from the record that the commission, in estimating the fair value of the property, failed to take into consideration the element of value arising

from the fact that the plant of the company is that of a going concern, with an established business.

In fixing the amount to be allowed for interest during the period of construction of the plant, the commission had before it testimony as to the original cost of this item, and as to the amount which would be required in case of reproduction. From the evidence before it, the commission concluded that an allowance of interest for a period of one and one-half years would be sufficient. This was a matter of judgment to be exercised upon consideration of the facts. The plant was built to serve a number of communities, and would naturally be ready for use, in part, at different periods of time. Under proper management it would be earning money on some of its divisions long before they were all entirely completed. We cannot say that the conclusion reached by the commission in this respect was unreasonable, or that it was not in conformity with law.

The same thing may be said as to the action of the commission, with respect to brokerage. No allowance was made for that item of expense, for the reason that there was no evidence that the company ever paid any brokerage. The bonds issued by the company went out in great part, directly in exchange for various properties as they were taken over, and as the commission has found, were issued in excess of the real value of the properties taken over. A very wholesome provision of the present law places the issue of securities by a Public Service Company, under the supervision of the commission, and requires its certificate of valuation. In the present case, the company makes no claim that it ever actually paid any brokerage for the sale of its bonds, and if it had, such an item should properly be considered in connection with the interest charge, and should not be included in the fixed capitalization of the company as the basis of a permanent charge against the public.

The ascertainment of the fair value of the property, for rate making purposes, is not a matter of formulas,

but it is a matter which calls for the exercise of a sound and reasonable judgment upon a proper consideration of all relevant facts. The commission is not bound to adopt any one method to the exclusion of all others. It may take into consideration various methods, and use its judgment as to the extent to which they shall be employed. The original cost of the property is not to be taken as controlling, for there may have been extravagance in purchasing, or bad management; and, on the other hand, there may have been an actual increase in values since the original purchase or construction. Then again, the reproduction cost, less depreciation, may not give the present fair value of an old property, for it may not now be desirable to reproduce the old type of plant. Improved machinery, and better methods of operation, may have come into vogue, which would make it true economy to relegate much of the physical structure of an old plant to the scrap heap. Much must be left to the sound discretion of the appraising body, the tribunal appointed by law and informed by experience, for the discharge of these delicate and complex duties. Its report must, of course, justify itself in reason, upon review in the appellate courts.

A careful examination of the voluminous record in this case has led us to the conclusion that in the items wherein the Superior Court differed from the commission upon the question of values, there was merely the substitution of the former's judgment for that of the commission, in determining that the order of the latter was unreasonable.

The order of the Superior Court is, therefore, reversed, and the order of the Public Service Commission is reinstated; the costs in the Superior Court and in this court to be paid by the Ohio Valley Water Company.