424 A.2d 1213

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant

v.

PENNSYLVANIA GAS AND WATER COMPANY,
(WATER DIVISION), Appellee.

CITY OF SCRANTON et al.

v.

PENNSYLVANIA GAS AND WATER COMPANY,
(WATER DIVISION).

PENNSYLVANIA PUBLIC UTILITY COMMISSION,
Appellant,

v.

PENNSYLVANIA GAS AND WATER COMPANY—WATER
DIVISION, Appellee.

Office of Consumer Advocate and Pennsylvania
Attorney General, Intervenors.

Supreme Court of Pennsylvania.

Argued May 22, 1979.

Decided Feb. 1, 1980.

Rearguments Denied Feb. 18 and 27, 1981.

328

Dominic J. Ferraro, George M. Kashi, Michael P. Kerrigan, Joseph J. Malatesta, Jr., Harrisburg, for appellant.

Chas. E. Thomas, D. Mark Thomas, Patricia Armstrong, Harrisburg, W. Boyd Hughes, James J. Ligi, Wm. J. Purcell, Scranton, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION

NIX, Justice.

These two appeals present this Court with the troublesome issue of the correct standard to be employed by the Public Utility Commission (PUC) in fulfilling its legislative mandate to "ascertain and fix the fair value of the whole or any part of the property of any public utility." Act of May

28, 1937, P.L. 1053, art. III, § 311, 66 P.S. § 1151 (1958)[1] (the Act). For the reasons that follow, we are of the view that the PUC was correct in its determination and that its orders should not have been disturbed. Accordingly, we reverse the orders of the Commonwealth Court below.

The complex facts surrounding these appeals are fully set forth in the opinions of the Commonwealth Court.[2] For our purposes, the following brief factual recitation is sufficient. The appeal at No. 35 May Term 1978 (*PG&W I*) concerns construction and improvement projects undertaken by the Pennsylvania Department of Highways that were anticipated to affect the water supply of the Pennsylvania Gas & Water Company (PG&W) within its Roaring Brook watershed area. An agreement was entered into between the Department and PG&W to remedy and minimize the adverse effect of this federally funded highway project on the turbidity and purity of the water derived from the watershed. This agreement provided that the Department would contribute to PG&W a sum in excess of $2.7 million toward the construction of a new dam, reservoir, and a 30-inch pipeline. The PUC rejected the attempt by PG&W to include this $2.7 million payment in its base for accounting and rate making purposes.[3] The Commonwealth Court reversed the PUC on the ground that the exclusion of the $2.7 million payment from the rate base constituted a violation of the principles enunciated in *Keystone Water Co. v. PUC*, 19 Pa.Cmwlth. 292, 339 A.2d 873 (1975), affirmed by an equally divided Court, 477 Pa. 594, 385 A.2d 946 (1978). We granted the PUC's petition for allocatur.

1. This Act was repealed by the Public Utility Code of 1978, 66 Pa.C.S.A. §§ 101 *et seq.*, effective August 29, 1978. The instant appeals are concerned solely with the 1937 Act.

2. The opinion of the Commonwealth Court in No. 35 May Term 1978 (PG&W I) is set forth at 19 Pa.Cmwlth. 214, 341 A.2d 239 (1975). The opinion of that court in No. 278 January Term 1978 (PG&W II) is found at 33 Pa.Cmwlth. 143, 381 A.2d 996 (1977).

3. By including this payment into its base, PG&W could pass this windfall on to its stockholders and *also* request higher rates from the public in order to compensate for the injury to its watershed.

The appeal at No. 278 January Term 1978 (PG&W II) concerns PG&W's request for a two-step increase in its rates. The PUC approved the first step, but disallowed the second step after ascertaining and fixing PG&W's rate base at $87,700,000 and allowing it a return of 8.53 per cent. The Commonwealth Court reversed the PUC, finding that the PUC's determination of the fair value of PG&W's rate base was legally incorrect in view of its earlier opinions in the *PG&W I* and *Keystone*. We granted the PUC's petition for review and the petitions to intervene filed by the Attorney General and the Office of Consumer Advocate, and ordered the matters to be argued together.

### 1. The Appeal at No. 35 May Term, 1978

Before we discuss the legal and historical basis surrounding the "fair value" controversy, we think it proper to set forth the rationale employed by the PUC in support of its Order rejecting PG&W's attempt to include the state's $2.7 million payment in its base for accounting and rate making purposes:

For public utility accounting and rate making purposes we must reject respondent's contention. Property, which is used or useful in rendering a public utility service and which has been a part of a public utility's rate base is dedicated to a public use, and is impressed with a public trust. If (or the proceeds or accruals therefrom) is subject to regulation by the properly designated regulatory body and remains subject to that regulation until such time as that regulatory body duly finds it in the public interest to approve its release from public service. Such property must be regulated in the interest of the public no less than in the interest of the utility. Equities must be balanced and justice must be done to all concerned. Accordingly, when a utility suffers extraordinary losses in service value of utility property abandoned or otherwise retired from service, or suffers unforeseen damages to property which damages could not reasonably be anticipated, and where the utility has not otherwise recovered its investment, this

Commission can and, where equities require, does permit the utility to recover from the ratepayers, as a proper and necessary expense of rendering the public service, the necessary amount to make the utility whole. On the other hand, where, as here, the utility recovers an amount or sum as a result of compensation for particular property and the potential consequential injury to the service of the ratepayers for whom that property was dedicated to the public use, the Commission, where the equities dictate, may require that amount received by the utility to be treated, for public utility accounting and rate making purposes, in such manner as will place the utility and the ratepayers in the same position, insofar as reasonably possible, as they were before the extraordinary event or transaction which gave rise to the sum or amount in question.

For rate making purposes, we cannot permit respondent to receive all the salutary effects of the agreement and pass them on to the stockholders as a windfall while passing on to the ratepayers only the increased rates that would become necessary had there been no agreement and contribution. Clearly, the payment in question resulted and stemmed from consideration of the property's dedication to public use as a water utility, and recognition of the potential injury to the interests and service of the water utility customers. In situations and circumstances such as this, the customers of a utility are in the nature of third party beneficiaries whose interest in the utility service must be protected. The essence of public utility regulation is the protection of the public and the assurance of adequate service to them at reasonable rates on the one hand, and, on the other, a fair opportunity to the utility to secure a reasonable rate and no windfall from such services. To reflect equitably and meaningfully the near restoration of, or equitable substitution for, the pre-agreement status quo, both the utility and its customers must be made whole insofar as reasonably possible.

First, the majority opinions of the Commonwealth Court in *Keystone* and in the instant case reflect a misperception of the regulatory authority of the Commonwealth and its chosen instrumentality for carrying out the desired objectives (the Pa. PUC) and the significance of the notion of deference which accompanies that regulatory scheme. The PUC's functions in valuing utility property[4] and in fixing just and reasonable rates of return thereon[5] are exercises of the regulatory powers of the Commonwealth. *Cf., Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). Regulation amounts to a taking when government forces "some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. U.S.*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Accordingly, it must be determined whether the PUC's exclusion from PG&W's rate base of a payment made out of public funds to construct a reservoir and pipeline to minimize the effects of a public construction project on the performance of water supply functions which are public in nature, forced PG&W's investors and shareholders alone to bear public burdens which in fairness and justice should have been borne by the utility's rate payers as a whole.

4. Valuation of property of a public utility

The commission may, after reasonable notice and hearing, ascertain and fix the fair value of the whole or any part of the property of any public utility, in so far as the same is material to the exercise of the jurisdiction of the commission, and may make revaluations from time to time and ascertain the fair value of all new construction, extensions, and additions to the property of any public utility. When any public utility furnishes more than one of the different types of utility service enumerated in paragraph seventeen of section two of this act [66 P.S. § 1102(17)], the commission shall segregate the property used and useful in furnishing each type of such service, and shall not consider the property of such public utility as a unit in determining the value of the property of such public utility for the purpose of fixing rates. Public Utilities Law, § 311, 66 P.S. § 1151.

5. Rates to be just and reasonable

Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable and in conformity with regulations or orders of the commission. *Id.* at § 301, as amended, 66 P.S. § 1141.

■ The second deep-rooted fallacy in the Commonwealth Court analysis in this area has to do with confusing valuation for eminent domain purposes with valuation for regulatory purposes. These various processes of valuation are no more necessarily interrelated or interdependent than valuation for real property assessment purposes or any other circumstance in which the law requires valuation of property for the performance of a discrete and separate governmental function. *See generally* Bonbright, Valuation of Property (1937). The mere fact that a particular part of the company's property was valued at its cost of reproduction in an eminent domain award is not dispositive nor controlling as to its proper valuation for regulatory purposes. The purpose of just compensation in eminent domain is to put the owner "in as good a position pecuniarily as it would have occupied, if its property had not been taken." *U. S. v. New River Collieries*, 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014 (1923). But it has been cogently observed that "the purpose of regulating utility rates, unlike that of condemning property, is to correct an economic maladjustment whereby the company owning the property is adjudged to have an undue advantage over the rest of the community." Hale, Freedom Through Law—Public Control of Private Governing Power, p. 463.

■ In the case of water companies, the advantages which they have secured over the rest of the community have stemmed directly from their status as public corporations. *White v. City of Meadville*, 177 Pa. 643, 35 A. 695 (1896). For example, at various times, water companies have been vested with eminent domain taking powers which gave them the right to take streams [6] and to acquire land to preserve their water supply from contamination.[7] So, too, such rights as any water company enjoys to divert water for the purpose of supplying municipalities or other consumers are, because they exceed the common law rights of the riparian

6. Corporation Act of 1874, Act of April 29, 1874, P.L. 73, No. 32, § 34 as amended by the Act of May 16, 1889, P.L. 226, No. 232.

7. Act of May 26, 1893, P.L. 158, No. 103.

owner, wholly public in that they arise by virtue of public eminent domain and regulatory powers. *Lord v. Meadville Water Co.,* 135 Pa. 122, 19 A. 1007 (1890); *Haupt's Appeal,* 125 Pa. 211, 17 A. 436 (1889).

In refusing to include the $2.7 million contribution made by the Commonwealth toward the capital construction costs of the reservoir and pipeline necessitated by the anticipated impact of the federally aided highway construction project in PG&W's rate base, the PUC in effect disallowed PG&W an addition to the original cost measure upon which the property in question was valued. In so doing, PG&W contends that the PUC contravened the controlling statutory norm requiring it "to ascertain and fix the *fair value* of the whole or any part of the property of any public utility." Public Utility Law, § 311, 66 P.S. § 1151 (emphasis supplied). PG&W further contends that this statutory norm of "fair value" either incorporates by reference the meaning of that term as adumbrated in *Smyth v. Ames*[8] or, in the alternative, is bottomed on the continuing validity of *Smyth* as a standard for adjudicating the constitutionality of rate regulation under the Federal Constitution.

In construing the statutory norm of fair valuation, we must, of course, view that standard within the context of

---

8. 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). The holding in *Smyth* reads as follows:

> We hold . . . that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction; the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth. *Id.* at 546, 18 S.Ct. at 434.

the enactment as a whole. Accordingly, we find that the overriding principle governing the PUC's performance of its duty is to determine "just and reasonable" rates pursuant to Public Utility Law § 301, 66 P.S. § 1141. *New York Telephone and Telegraph v. PSC*, 309 N.Y. 569, 579–580, 132 N.E.2d 847, 850–51 (1956). Thus, the "fair value" must reflect rates that are "just and reasonable." The rate making function consists of a two-step process to effectuate the paramount responsibility of fixing "just and reasonable" rates: fair valuation of utility property and the ascertainment of a reasonable rate thereon. There is ample authority for the proposition that the power to fix "just and reasonable" rates imports a flexibility in the exercise of a complicated regulatory function by a specialized decision-making body and that the term "just and reasonable" was not intended to confine the ambit of regulatory discretion to an absolute or mathematical formulation but rather to confer upon the regulatory body the power to make and apply policy concerning the appropriate balance between prices charged to utility customers and returns on capital to utility investors consonant with constitutional protections applicable to both. *See Utah Power and Light Co. v. PSC*, 107 Utah 155, 190–191, 152 P.2d 542, 558 (1944). *Accord, State v. N. J. Bell Telephone Co.*, 30 N.J. 16, 152 A.2d 35 (1959).

The opinion in support of affirmance in *Keystone* did not deny the primacy of the "just and reasonable" standard or that it represented a delegation of policy-making powers to the PUC which are basically legislative in nature. That opinion, however, accepted the notion that the term "fair value" was intended to have a fixed meaning incorporating by reference the rule in *Smyth v. Ames*, as interpreted in *Bluefield Water Works v. Public Service Commission*,[9] with respect to the weight of reproduction cost data in rate making. *Keystone*, 477 Pa. at 607–08, 385 A.2d at 953–54.

The legislative history of public utility regulation in this Commonwealth does not support this assertion. The 1913 Public Service Company Law which is the grandfather of

9. 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

the present statute spelled out the meaning of "fair value" by express incorporation of each factor enumerated in *Smyth v. Ames.* Act of July 26, 1913, P.L. 1734, No. 854, art. V, § 20. The purpose of such enumeration was to draft a constitutionally valid statute by including therein almost *in ipsis verbis* the constitutional rule concerning rate fixing powers as it was understood at the time that the statute was drafted. *See* Munson, The Public Service Company Law (1914). The 1937 statute superseding the 1913 law significantly omitted any definition or specification of the meaning of "fair value." The Superior Court considered that this omission was consistent with a legislative intent to define "fair value" as synonymous with that concept as expressly defined by the prior statute and in *Smith v. Ames. Solar Electric Co. v. PUC,* 137 Pa.Super. 325, 326, 9 A.2d 447 (1939). However, this omission is equally consistent with a legislative intent to free itself from the shackles of express adherence to an understanding of the constitutional meaning of "fair value" which was in evolution at the time that the 1937 statute was drafted. *See* Rose, *The Hope Case and Public Utility Valuation,* 54 Col.L.Rev. 188, 195 (1954); Bauer & Gold, Public Utility Valuation for Purposes of Rate Control, p. 155 *et seq.* (1935).

In any event, even assuming *arguendo* that the legislature intended to acquiesce in the "fair value" principle as enunciated in *Smyth v. Ames,* little comfort is thereby afforded to PG&W. The rule in *Smyth v. Ames* fixes the very broad constitutional boundaries within which the legislature may exercise or infer discretionary leeway in rate-making. As a leading commentator observed:

It is obvious that the instruction that is the essence of 'fair value'—to give the matters for consideration (principally original cost and reproduction cost) such weight as may be just and right—is not operational. It offers no criterion or rule to determine what is 'just and right' and, therefore, does not provide a method to ascertain a uniquely determinate value of the weight to be assigned to each of the 'matters for consideration' in a finding of

fair value. . . . The fact is that *fair value is an indeterminate magnitude lying anywhere between original cost and reproduction cost.* [Emphasis added]. Rose, *Confusion in Valuation for Public Utility Rate Making,* 47 Minn.L.Rev. 1, 23 (1962).

 Properly understood, *Smyth v. Ames* speaks only to the outer boundaries beyond which, on the one hand, a regulator approaches an uncompensated eminent domain taking of investor property by valuing it below its original cost and, on the other hand, a regulator approaches an unlawful taxation of consumers under the guise of rate fixing by valuing the property in excess of its reproduction cost. Between these extremes, the question is one of policy for the regulatory body concerning which the judicial branch is not warranted in interposing economic theories. Unless the PUC's decision does not bear a real and substantial relationship to the regulatory objects sought to be obtained by it, that judgment must prevail. *Gambone v. Commonwealth,* 375 Pa. 547, 101 A.2d 634 (1954); *Pennsylvania State Bd. of Pharmacy v. Pastor,* 441 Pa. 186, 272 A.2d 487 (1971).

 Thus, "fair value" as understood in *Smyth v. Ames* does not compel reversal of the PUC's determination either as a matter of statutory or constitutional law. In the instant case, the PUC duly considered the evidence proffered by PG&W as to the reproduction cost of the watershed properties but concluded that, under the circumstances of the particular case, the allowance of any addition to original cost figures for rate making purposes was not just and reasonable and that the 2.7 million dollar payment should be more appropriately treated as a "contribution," as it was designated by the agreement between PG&W and the Department of Highways, rather than as an additional investment of capital. As we observed in an earlier case:

The ascertainment of the fair value of the property, for rate making purposes, is not a matter of formulas, but it is a matter which calls for the exercise of a sound and reasonable judgment upon a proper consideration of all relevant facts. The commission is not bound to adopt any

one method to the exclusion of all others. It may take into consideration various methods, and use its judgment as to the extent to which they shall be employed. The original cost of the property is not to be taken as controlling, for there may have been extravagance in purchasing, or bad management; and, on the other hand, there may have been an actual increase in values since the original purchase or construction. Then again, the reproduction cost, less depreciation, may not give the present fair value of an old property, for it may not now be desirable to reproduce the old type of plant. Improved machinery, and better methods of operation, may have come into vogue, which would make it true economy to relegate much of the physical structure of an old plant to the scrap heap. Much must be left to the sound discretion of the appraising body, the tribunal appointed by law and informed by experience, for the discharge of these delicate and complex duties. Its report must, of course, justify itself in reason, upon review in the appellate courts. *Ben Avon Boro v. Ohio Valley Water Co.*, 260 Pa. 289 at 308–309, 103 A. 744 at 750 (1918).

■ The error which the Commonwealth Court and the opinion in affirmance in *Keystone* fell into was the assumption of a constitutionally mandated nexus between the "fair value" standard and cost of reproduction figures. The unsoundness of this assumption is manifested in the fact that this Court denies that reproduction cost figures have any probative value for real property tax assessment purposes because of their hypothetical and speculative nature. *Buhl Foundation v. Bd. of Property Assessment*, 407 Pa. 567, 180 A.2d 900 (1962); *U. S. Steel Corp. v. Bd. of Assessment & Rev. of Taxes*, 422 Pa. 463, 223 A.2d 92 (1966). Reproduction cost figures are clearly admissible in PUC proceedings but we see nothing in the "fair value" rule that requires, either as a statutory or constitutional mandate, that they *must be accepted* in whole or in part for valuation purposes. We, therefore, repudiate any intimations in these decisions or in prior case law that has the effect of suggesting a constitu-

tional mandate requiring the inclusion of reproduction cost figures in arriving at the appropriate rate structure in public utility valuation cases.

To follow the Commonwealth Court and the opinion in affirmance in *Keystone* down the path of attempting to apply a constitutional taking analysis to valuations of property by the PUC which do not go beyond original cost, is unsound both in principal and as a matter of judicial policy.

In the former respect, it commits the judicial branch to a constitutionally grounded review of all rate requests in which the PUC has on an item by item basis failed to go beyond original cost valuation. In the case at bar, PG&W sought to include a replacement cost figure *in toto* in the rate base because of the fortuity that the property in question was subject to taking for eminent domain purposes. But if PG&W's entitlement is constitutionally founded, then it must be accorded revaluation at reproduction cost as to every item on its property concerning which it requests revaluation since the maturing of its constitutional rights cannot turn on the mere happenstance of a public taking. It is no answer to say that the PUC's accounting rules do not permit such a result since the accounting rules as creatures of statute cannot prevail against a constitutionally grounded right.

In the latter respect, the opinions commit us without either statutory or constitutional warrant to a slippery slope of judicial intervention into rate making whose limit we cannot now foresee. We can, call upon the experience of the United States Supreme Court with respect to judicial intervention in these matters as a guide. As Justice Stone warned in his dissenting opinion in *West v. Chesapeake & Potomac Telephone Co.*, 295 U.S. 662, 689, 55 S.Ct. 894, 905, 79 L.Ed. 1640 (1935), "In assuming the task of determining judicially the present fair replacement value of the vast properties of public utilities, courts have been projected into the most speculative undertaking imposed upon them in the entire history of English jurisprudence." It is a task which this Court refused to undertake in *Ben Avon Boro, supra*

and the wisdom of that judgment was ultimately recognized by the United States Supreme Court in *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037 (1942) (the Constitution does not bind rate making bodies to the service of any single formula or combination of formulas). Thus in *Natural Gas Pipeline* that Court limited its scope of review, "if the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end." *Id.*

■ A careful examination of the record in this case has led us to the conclusion that in the items wherein the Commonwealth Court differed from the PUC upon the questions presented to it, there was merely the substitution of the court's judgment for that of the Commission, rather than a determination that the order of the latter was unlawful.

Accordingly, we reverse the order of the Commonwealth Court below, and reinstate the order of the Public Utility Commission.

### 2. The Appeal at No. 278 January Term, 1978

■ As the preceding discussion has totally undercut the legal foundation for the Commonwealth Court's decision in this case, we reverse that court's order entered below. Based on our analysis of the arguments presented to this Court on the merits of the rate increase, we find that the order of the PUC is supported in law and by sufficient facts. Accordingly, we reinstate the order of the PUC entered below.

The orders of the Commonwealth Court are reversed and the orders of the Public Utility Commission are reinstated.

MANDERINO, J., did not participate in the decision of this case.

ROBERTS, J., joins the majority and filed a concurring opinion.

LARSEN, J., joins the majority and filed a concurring opinion.

ROBERTS, Justice, concurring.

The PUC is statutorily and constitutionally obliged to set "just and reasonable" rates and may, but is not required to, use cost of reproduction in the rate base. See *Keystone Water Co. v. Pennsylvania Public Utility Commission*, 477 Pa. 594, 615–26, 385 A.2d 946, 957–63 (1978) (Opinion of Roberts, J., in Support of Reversal, joined by Eagen, C. J. & Nix, J.). I join the majority opinion which is in accord with the views expressed in the Opinion in Support of Reversal in *Keystone Water*, and I agree with the majority that the orders of the Commonwealth Court should be reversed and the orders of the PUC reinstated.

LARSEN, Justice, concurring.

I join in the majority opinion. Additionally, I would add that under no circumstances can a "windfall" or gift to a utility be included in a rate base.