## Pennsylvania State Board of Pharmacy v. Pastor

*Joseph Nessley, David N. Savitt and John P. Walsh,* for appellant.

*Walter E. Alessandroni, Attorney General, Charles A. Woods, Jr., Deputy Attorney General and Norman Ackerman, Assistant Attorney General,* for appellee.

LIPSITT, J., April 21, 1966.—This proceeding is an appeal from an adjudication and order of the Pennsylvania State Board of Pharmacy (hereinafter called "board" or "Commonwealth"), dated April 12, 1965, revoking the license of appellant, Edward Robert Pastor (hereinafter called "Pastor" or "appellant"), to practice the profession of pharmacy in the Commonwealth of Pennsylvania.

The following facts, which are substantially the same as the board's findings, were adduced at a hearing held by the board on December 9, 1964, pursuant to a citation issued against Pastor. Pastor is a registered pharmacist whose license was issued on June 26, 1941. On or about June 23, 1964, he caused a newspaper advertisement to appear in the Camden Courier, a newspaper of general circulation; the advertisement covered approximately one-half page and contained a list of items identified as Peritrate, Miltown, Diuril, Serpasil, Elavil, etc., with prices for a specific number of capsules or tablets. Pastor was the pharmacist-manager of the Park and Lock Drugs, Inc., of Philadelphia, Pa., and was solely responsible for placing this advertisement on behalf of said company. The Courier, published in New Jersey, was distributed in Philadelphia, Pa., at least from the newsstands.

On July 9, 1964, the board imposed on Pastor a three-day suspension from engaging in the practice of pharmacy from August 1, 1964, to August 3, 1964, inclusive. This suspension was based upon a prior advertisement which had been inserted in the Philadelphia Inquirer. On August 1, 1964, he was observed by an investigator for the board working in the preparation and dispensing area of the Park and Lock Drugs, Inc., store.

The citation charged Pastor with two violations under the Pharmacy Act of September 27, 1961, P. L. 1700, 63 PS §390, as follows: (1) In promoting by advertising in a newspaper of general circulation, dangerous drugs and/or narcotics by name and prices to the public, and (2) engaging in the practice of pharmacy while under suspension.

It is noted that in the findings of fact by the board, it was stated that Pastor was working in the preparation and dispensing area of said store, "where he was observed filling prescriptions and carrying on

trade with prescription customers". However, there was no conclusion of law relating to this violation. The only pertinent conclusion stated that "Respondent, Edward Robert Pastor, by placing the ad in the June 23, 1964, issue of the Camden Courier, violated Section 5(a)(6) and Section 8(11) of the Pharmacy Act, the Act of September 27, 1961, P. L. 1700". The order of the board reads that "pharmacist's license issued to Edward Robert Pastor is hereby revoked . . . for violation of Sections 5(a)(6) and 8(11) of the Pharmacy Act. . . ."

Section 5(a)(6), 63 PS §390-5, of the Pharmacy Act provides:

"(a) The board shall have the power to revoke or suspend the license of any pharmacist upon proof satisfactory to it that: . . .

"(6) He has violated or permitted the violation of any provision of this act or regulation of the board; . . ."

Section 8(11), 63 PS §390-8 of the Pharmacy Act provides:

"It shall be unlawful for: . . .

"(11) Any pharmacist or owner of a pharmacy advertising or promoting dangerous drugs, narcotics or drugs containing either by name or prices therefor to the general public".

Because the conclusions of law and the order of the board, as well as Commonwealth's brief, make no references to the charge of engaging in the practice of pharmacy while under suspension, no consideration need be given to the question whether satisfactory evidence was presented to show that drugs were actually dispensed during the suspension period.

Appellant has set forth two propositions which the court has considered:

(1) That section 8(11) of the Pharmacy Act of 1961 is unconstitutional in that it violates article I,

sec. 9, of the Pennsylvania Constitution and the Fourteenth Amendment to the United States Constitution, in that it deprives Pastor of his property and right to conduct his business without due process of law.

(2) That there was insufficient evidence before the board to prove the items advertised were drugs of such a nature so as to fall within the purview of said section 8(11) of the Pharmacy Act.

The principal contention relates to the question of the constitutionality of the act. Appellant recognizes the principle that it is an important function of government to exercise the police power to preserve public health, safety and morals, and to accomplish this purpose, the legislature may limit the enjoyment of personal liberty and property. He cites several Pennsylvania cases where the Supreme Court has proclaimed that a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive, or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be obtained. In Gambone v. Commonwealth, 375 Pa. 547 (1954), an act regulating the size of signs used to advertise the price of liquid fuels in gasoline stations was held void. In Cott Beverage Corporation v. Horst, 380 Pa. 113 (1955), the court declared unconstitutional an act prohibiting the use of Sucaryl as a sweetening agent. In Commonwealth ex rel. Woodside v. Sun Ray Drug Company, 383 Pa. 1 (1955), where defendant was enjoined from selling milkshakes with ice milk on the ground it violated the Pennsylvania Ice Cream Law by selling an inferior simulation of ice cream, the court held the sales of the drink did not constitute a violation of the statute and that competition cannot be stifled through an exercise of the police power except where it is in the public interest.

The Commonwealth directs attention to the case of

Ullom v. Boehm, 392 Pa. 643 (1958), in which the Pennsylvania Supreme Court refused to strike as unconstitutional a 1956 statutory amendment prohibiting the advertising of prices of products used for ophthalmic purposes. The court regarded the regulation of such wares as a valid exercise of police power because the welfare of the people would be ". . . served by removing from dealers the temptation to sell to the public, eye-damaging glasses in order to adhere to an arbitrary established reduced budget". (page 648).

Appellant attempts to distinguish Ullom from the instant case by asserting there can be no possible danger to the public in permitting the advertisement of drugs, as the pharmacist has no discretion in the quality of the drug he passes on to the public and no discretion as to what specific drug he dispenses, because it is the physician who prescribes the drugs and the drug companies who manufacture them. He reasons that the pharmacist merely gives to the public what is called for by the physician and manufactured by the company; by advertising his prices, the public can only benefit and there is no danger of harm.

Although this is apparently a question of first impression in the field of pharmacy, it would seem, in light of the prevailing moral and social ills which beset a segment of our population, the argument of Pastor is somewhat hollow. It would be more rational to believe that by prohibiting the advertisement of narcotics and dangerous drugs, the incidence of use for other than medicinal purposes would be diminished, and any attempt by the legislature to takes steps to lessen the chances of this use would be in the public interest and within the police power of the state. The suffering of the deviate and the related criminal activities accompanying dangerous drug and/or narcotic addiction justify restrictive measures to be taken to serve the public welfare.

Pastor has quoted an advisory opinion by the Attorney General of Missouri dated August 7, 1961 (no citation available), which said in part that a rule promulgated by the pharmacy board prohibiting the advertising of prescription drugs was invalid. The Supreme Court of the State of Florida held that a pharmacy board rule prohibiting advertisement of name or price of prescription drugs is invalid, being an unjustifiable attempt to prohibit price competition in prescription drug business without any reasonable relation to public safety, health, morals or general welfare: Stadnik v. Shell's City, Inc. Fla., 140 S. 2d 871 (1962).

In both the opinion by the Attorney General of Missouri and in the Stadnik case, the prohibition involved applied to only prescription drugs, and in the present case the prohibition pertains to dangerous drugs and/or narcotics. However, difficulty in drawing a distinction in reasoning does exist because, as a practical matter, the statute herein prohibits the advertisement of prescription drugs. Nevertheless, the limitation to dangerous drugs and/or narcotics does establish an area of concern which is different from and more precise than mere prescriptions. Although it would be in the interest of the public to obtain prescriptions at as cheap a price as possible, the advantages of free enterprise in this field may be too high a price to pay where the protection of the public is involved. Even though a prescription ordinarily may be required and the integrity and ethics of the medical profession is unquestioned, the promotion and advertising of dangerous drugs and narcotics would certainly to a degree titillate an aberrant person and create an atmosphere of easy availableness. It may also be pointed out that the Pennsylvania Legislature enacted the statute here; this is not a situation where a rule is made by the pharmacy board. It has been held in this State in Kelley v. Earle, 325 Pa. 337, 345 (1937), that "[w]hile it is the duty of

the courts to uphold the Constitution, it is likewise their duty not to declare an act unconstitutional unless it is imperatively necessary to do so". In Pennsylvania, legislation has been most liberally construed in favor of constitutionality and, where practicable, a statute should be construed so as to make it constitutional: Marshall Impeachment Case, 363 Pa. 326 (1949). In the interpretation of an act of legislation, a construction resulting in the unconstitutionality of a statute will be avoided: Commonwealth v. James J. Cochran Post No. 251 of the V.F.W. of U.S., 350 Pa. 111 (1944). This statutory prohibition against advertising or promotion of dangerous drugs or narcotics serves in some measure to protect the public health and welfare, and thus is a reasonable use of the police power and constitutional.

In connection with the contention that there was insufficient evidence presented at the hearing before the board concerning the nature, use or composition of any of the alleged drugs which were advertised, the position of Pastor does appear to be sound. The Pharmacy Act of 1961, supra, sets forth in its definition of narcotic drug or dangerous drug that the terms mean ". . . any drug designated as such under the provisions of The Drug, Device and Cosmetic Act of Pennsylvania": section 2(7) Pharmacy Act of September 27, 1961, P. L. 1700, 63 PS §390-2.

In The Drug, Device and Cosmetic Act of September 26, 1961, P. L. 1664, sec. 2, 35 PS §780-2, the following definitions appear:

"(g) The term 'narcotic drug' means (1) opium; (2) cocoa leaves (except decocainized cocoa leaves or extracts of cocoa leaves which extracts do not contain cocaine or ecgonine) ; (3) marihuana; (4) isonipecaine (any substance identified chemically as 1-methyl-4-phenyl-piperidine-4-carboxylic acid ethyl ester, or any salt thereof, by whatever trade name designated) ; (5)

any drug or other substance found by the United States Secretary of the Treasury or his delegate, and proclaimed by him or his delegate after due notice and opportunity for public hearing, to have an addiction-forming or addiction-sustaining liability similar to morphine or cocaine ; (6) any compound, manufacture, salt, derivative or preparation of the substance referred to in clauses (1) through (5) ; (7) any substance (and any compound, manufacture, salt, derivative or preparation thereof) which is chemically identical with any substance referred to in clauses (1) through (5). . . .

" (h) The term 'dangerous drug' means a drug other than a narcotic drug as defined in paragraph (g) of this section, which (1) contains any quantity of barbituric acid, bromal, carbromal, chloral, alpha-eucaine, beta-eucaine, paraldehyde, peyote, sulfonmethane, or any chemical derivative thereof which derivative has been, by the secretary after investigation and after consultation with and on the recommendation of the board, found to be habit-forming and by regulations designated as a dangerous drug; or (2) contains any quantity of amphetamine or any isomer thereof; or (3) because of its toxicity or other potentiality for harmful effect or the method of its use or the collateral measures necessary to its use has been found by the secretary, after investigation and after consultation with and on the recommendation of the board, not safe for use except under the supervision of a practitioner licensed by law to administer such drug and has by regulation been designated a dangerous drug; or (4) is limited under the Federal Act to use under the professional supervision of a practitioner licensed by law to administer such drug".

In the present case, no evidence whatsoever was presented from which the board could have concluded that the items advertised by Pastor in the Camden Courier

were dangerous drugs or narcotics within the meaning of the act. The items advertised were brand names, and it was necessary for the Commonwealth to prove the composition and contents of these items or have the board take official notice of the same.

A certain confusion exists in the arguments because of the wording of the statute, which reads "advertising or promoting dangerous drugs, narcotics or drugs containing either by name or prices therefor. . . ." The word "drugs" could not sensibly be considered a separate category, else practically every drugstore advertisement would be illegal. The intention of the legislature must have been to prevent advertising or promoting dangerous drugs and narcotics or drugs containing the ingredients of either dangerous drugs or narcotics.

The transcript of the hearing, as well as the board's adjudication and order, including the discussion and the Commonwealth's brief, are devoid of any mention of the quality or contents of any of the items advertised.

The Administrative Agency Law, Act of June 4, 1945, P. L. 1388, sec. 44, 71 PS §1710.44, permits this court on appeal, where ". . . any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence", to set aside or modify the adjudication in whole, or in part, or to remand the proceedings to the agency.

Where an agency revokes a license to practice a profession, there should be sufficient evidence to substantiate the violations charged against the licensee. It cannot be assumed that the board drew the correct inferences. The Commonwealth in its brief indicates that the word " 'prescriptions' in the advertisement gives credence to the Board's inference and conclusions", and again, "They [members of the pharmacy board] know what are drugs, etc., and what are not; and each

and every one of them, unanimously, determined that what were advertised were drugs, etc". It is conceivable that the board did not in fact consider the specific meaning and composition of dangerous drugs or narcotics in finding that the advertisement was improper.

In accordance with this opinion, we, therefore, make the following

ORDER

And now, April 21, 1966, the proceedings are remanded to the board for the purpose of making definite findings of fact and conclusions of law relative to the quality and contents of the drugs advertised by appellant.