# Pennsylvania State Board of Pharmacy v. Pastor, Appellant.

Argued June 14, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*David N. Savitt*, with him *John Patrick Walsh*, for appellant.

*Norman Ackerman*, Assistant Attorney General, with him *William C. Sennett*, Attorney General, for Pennsylvania State Board of Pharmacy, appellee.

OPINION PER CURIAM, November 14, 1968:
Order affirmed.

---

DISSENTING OPINION BY HOFFMAN, J.:

This is an appeal by Edward Robert Pastor from a decision of the Court of Common Pleas of Dauphin County, sitting as the Commonwealth Court. The lower court modified the adjudication of the Pennsylvania State Board of Pharmacy which had revoked Pastor's license to practice pharmacy in this Commonwealth. The court directed a suspension of the license for six months.

The undisputed facts may be set out briefly as follows: On June 23, 1964, Pastor, the pharmacist manager of the Park and Lock Drugs, Inc., placed an advertisement in the Camden Courier, a newspaper published in New Jersey but distributed in Philadelphia. This advertisement contained a list of certain drugs with the prices for each.

As a result of this advertisement, the State Board of Pharmacy issued a citation charging that Pastor violated Section 8(11) of the Pharmacy Act, Act of

September 27, 1961, P. L. 1700, §8(11), 63 P.S. 390-8(11) which provides:

"It shall be unlawful for. . . .

"(11) Any pharmacist or owner of a pharmacy advertising or promoting dangerous drugs, narcotics or drugs containing either by name or prices therefor to the general public."

A hearing was held before the State Board on December 9, 1964, pursuant to which the Board revoked Pastor's license. Pastor appealed to the Commonwealth Court which remanded the case to the Board for the purpose of making definite findings of fact relative to the quality and contents of the drugs advertised. Pursuant to the court order, a second hearing was held before the Board and supplementary findings of fact and conclusions of law were made to the effect that the drugs advertised included dangerous drugs within the meaning of The Drug, Device and Cosmetic Act, Act of September 26, 1961, P. L. 1664, §2(h), 35 P.S. §780-2(h). Thereafter, this matter was reargued in the court below and the Board's order of revocation was modified resulting in a six months suspension. This appeal followed.

In this appeal, Pastor argues, inter alia, that Section 8(11) of the Pharmacy Act is unconstitutional in that it deprives appellant of his property and right to conduct his business without due process of law.

In affirming the action of the lower court, the majority has, sub silentio, rejected Pastor's argument. I believe the majority has erred in this regard.

In my opinion, Section 8(11) of the Pharmacy Act, supra, which prohibits the advertisement of certain drugs, is unconstitutional in that it deprives appellant of his property without due process of law.

Governments, in the exercise of their police powers, may limit the individual's personal liberty if nec-

essary for the preservation of the public health, safety and morals. This police power, however, is not unrestricted. A law which purports to be an exercise of the police power may not be unreasonable, unduly oppressive or patently beyond the necessities of the case. It must seek a legitimate objective and the means which it employs must have a real and substantial relation to the objects sought to be obtained. *Cott Beverage Corp. v. Horst,* 380 Pa. 113, 110 A. 2d 405 (1955). Our Supreme Court stated in *Gambone v. Commonwealth,* 375 Pa. 547 at 551-2, 101 A. 2d 634 (1954): "Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts."

The lower court, in its first opinion, upheld the constitutionality of this statute on the ground that ". . . the promotion and advertising of dangerous drugs and narcotics would certainly to a degree titillate an aberrant person and create an atmosphere of easy availableness." It also suggests that "by prohibiting the advertisement of narcotics and dangerous drugs, the incidence of use for other than medicinal purposes would be diminished." 39 Pa. D. & C. 2d 641 at 645 (1966).

In my opinion, these conclusions are without substance as the dangerous drugs covered by this act may be dispensed only on doctor's prescription. The lower court's analysis, therefore, in effect, suggests the corruptibility of physicians, pharmacists or both. It assumes that advertising of drugs will cause physicians

to write more prescriptions for their use, or that pharmacists will distribute them without prescription. There would appear to be little basis for such an inference.

The pharmacist is strictly controlled in the drugs which he may sell and is without power to distribute them without medical authorization. See Act of September 26, 1961, P. L. 1664, §4, 35 P.S. §780-4. Breach of this duty will subject him to criminal prosecution. Act of September 26, 1961 P. L. 1664, §20, as amended, 35 P.S. §780.20. The reference to an "atmosphere of easy availableness" in the lower court's opinion, therefore, disregards the inhibiting effect of criminal legislation.

Moreover, it is not at all demonstrated that the prohibition on advertising bears any reasonable relation to the object allegedly sought to be obtained. An "atmosphere of easy availableness" and the "titillation of the aberrant" even if shown does not result in actual "easy" availability or in an increase for nonmedicinal use of the drugs in question. The Commonwealth must show that such drugs would be more available for improper use were advertising allowed. This it has palpably failed to do.

It is not a natural inference that the advertising of drugs would be conducive to improper drug use. Indeed, there is a complete absence of facts and testimony indicating any corelation between advertising and the eventual improper use of drugs. Rather, we are left with the task of straining to find any basis in fact for upholding the constitutionality of the statute. I find none. Therefore, the legislation must be stricken.

All parties agree that this is a case of first impression in Pennsylvania. A similar case was decided, however, in *Stadnik v. Shell's City, Inc.*, 140 So. 2d 871 (Fla. 1962). There, the pharmacy board

issued a rule prohibiting the advertisement of name or price of prescription drugs. The Supreme Court of Florida held the rule to be an unjustifiable attempt to prohibit price competition in the prescription drug business. The case varies from ours in that it involves "prescription" drugs rather than "dangerous" drugs. In addition, it involves an administrative rule rather than a legislative act, which is entitled to a greater presumption of constitutionality. Nonetheless, the reasoning of the Supreme Court in that case is fully applicable here. The Court stated:

"The validity of Rule 2 must be measured by the established tests. It must bear a reasonable relationship to public safety, health, morals and general welfare. Lee v. Delmar, Fla. 1953, 66 So. 2d 252; State ex rel. Hathaway v. Smith, 160 Fla. 485, 35 So. 2d 650. Florida Dry Cleaning, etc., Board v. Everglades Laundry, 137 Fla. 290, 188 So. 380; Gillett v. Florida University of Dermatology, 144 Fla. 236, 197 So. 852. The sole question here is whether there is any reasonable relationship between the administrative Rule 2 and the public safety, health, morals and general welfare.

"It should be recalled that the rule prohibits the advertisement of names and prices of prescription drugs only. It is in no sense analogous to the rule of the Federal Bureau of Narcotics which prohibits the advertisement of all exempt narcotics which can be purchased *without* a doctor's prescription. While the findings of the Board purport to consider the welfare of the medical doctors, in actuality, they seem to disregard completely the professional competency of the physicians in the matter of prescribing drugs for their patients. The rule proceeds on the notion that the advertisement of a prescription drug will subject the physicians to some sort of irresistible pressures that will force them to prescribe drugs for their patients

simply on the basis of patient demand and without regard to the physical well-being of the patient. This concept disregards completely the professional and ethical integrity of the medical profession in prescribing remedies for patients. Furthermore, it actually suggests the probability of unethical conduct. In actuality, the rule has more resemblance to an economic regulation prohibiting price competition in the prescription drug business than it does to a regulation guarding the public health. An exhaustive and most helpful discussion of the problems which might very well arise appears in Comment, 'Prescription Drug Pricing in California: An Analysis of Statutory Causes and Effects,' 49 Calif. L. Rev. 340 (1961). The effect of the rule simply is that the druggist cannot advertise the price of a prescription drug even though he is prohibited by law from selling the drug except upon the prescription of a physician. There is simply no reasonable justification for such an administrative intrusion on private rights when the regulation is so completely lacking in public benefit. We, therefore, hold that the chancellor ruled correctly in finding Rule 2 of the appellant Board invalid." (at 874-5)

The Supreme Court of Florida, in my opinion, correctly recognized that this prohibition on price advertising, while advanced in the name of public interest, is completely lacking in any such benefit. Moreover, it must necessarily result in the stifling of price competition. The statute discourages a pharmacist willing to accept a lesser unit profit from selling at the lower price, because, without advertising, he cannot generate a sufficient volume to compensate for the lower profit margin. Thus, the statute encourages high drug prices and covert price fixing, because price reduction below list price would make little sense to pharmacists who could not publicize the difference in drug prices. Thus,

through indirection the statute achieves price control, which would otherwise be impermissible.

A similar but less dramatic situation was faced by the Supreme Court of Pennsylvania in *Gambone v. Commonwealth*, supra. There, the legislature had passed an act limiting the size of signs at gasoline stations advertising the price of gas. The Commonwealth argued that the purpose of the Act was to prevent fraudulent advertising of prices, price cutting and price wars. With respect to price cutting, the Court pointed out that in the absence of a question of monopoly or public interest, "the right of an owner to fix a price at which his property shall be sold is an inherent attribute of the property itself and as such within the constitutional protection of the requirement of due process of law." (p. 553).

Moreover, the lower court was undoubtedly incorrect in suggesting that such advertising leads to an increased incidence of nonmedicinal use. To the contrary, by contributing to the high cost of drugs, the statute probably leads to the reduced use of these vital drugs. A physician may prefer to forego prescribing certain drugs if he feels that to do so would impose a serious financial strain on his patients. It should not be forgotten that these drugs are intended to promote health and, often, patients are unable to survive without them. Yet, the result of this statute is to deny these people the opportunity to discover where such drugs might be purchased at the lowest cost. Rather, they are forced to buy these life-giving drugs without any guidance as to whether the price charged is reasonable in comparison with prices charged by others.

The State Board, in support of its position, cites *Ullom v. Boehm*, 392 Pa. 643, 142 A. 2d 19 (1958), in which our Supreme Court upheld the constitutionality of an act prohibiting the advertising of the sales price

for eyeglasses. There, the court agreed with the legislature that, faced with low profit margins induced by price competition, the opticians might cut corners and not devote sufficient time in preparing or fitting eyeglasses. Thus, the public welfare would be well served by removing from dealers the incentive to sell to the public inferior eye-damaging glasses.

*Ullom,* however, is inapposite on two counts. First, *Ullom* concerns itself only with the direct foreseeable impact that the statute would have on the dispensers of eyeglasses. It contains no conclusion that such advertising would create an unhealthy consumer demand. In this case, on the other hand, the sole thrust of the lower court's opinion is that advertising will result in harmful public demand and use. No allegation or suggestion is made by the lower court that pharmacists faced with price competition would sell inferior products.

Second, and more important, is the wide difference between the discretion accorded pharmacists and that accorded opticians in the dispensing of their products.

The pharmacist is severely limited in the action which he may take and acts in a purely ministerial capacity. He has no discretion in selecting the drug which he dispenses to the public, nor may he deviate from any prescription in the slightest manner. Thus, his license may be revoked or suspended if he compounds, dispenses or sells a drug "which contains more or less than the proportionate quantity of ingredient or ingredients specified by the person who prescribed such drug or device or which is of a brand or trade name other than that specified by the person prescribing such brand or trade name product or which contains an ingredient or ingredients of a brand or trade name other than that specified by the person prescribing such drug. . . ." Pharmacy Act, §5(a)(8), 63

P.S. §390-5(a)(8). Moreover, as we have already noted, criminal sanctions may be imposed if the pharmacist fails to adhere to these requirements.

The optician, on the other hand, while performing a function similar to that of the pharmacist in that he serves the public health, is subject to absolutely no supervision, control or direction. There is no license requirement for opticians in Pennsylvania. Indeed, it is a common practice for some retail stores to sell glasses prepared for them to their customers on a serve yourself basis. Under such circumstances it is clear that the Supreme Court was fully justified in finding constitutional a statutory scheme which imposes some restraints and protections where none otherwise existed.[1]

It is true that pharmacists still do compound some drugs. If the statute were limited to this activity alone, I might well agree with the Board. The statute here, however, includes all dangerous drugs, without regard to their preparation, and in my opinion, therefore, is overbroad. We should not limit a statute which is too broad by importing an interpretation which has no basis in the words themselves. It is an established doctrine that a statute will not be rewritten by the court to comply with constitutional requirements. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

In summary, I believe that to support this legislation, the lower court affirmed the Board by relying on nebulous references to the titillation of the aberrant, the creation of an atmosphere of easy available-

---

[1] It is true that optometrists, who are subject to licensing are also subject to this act. Optometrists, however, similarly exercise broad discretionary powers in examining, prescribing and, often, grinding and selling frames and lenses. The reasoning of *Ullom*, therefore, might also be applied to them.

ness and the increased incidence of nonmedicinal use. The statute, however, does not prevent the unwarranted dispensing of drugs, nor does advertising make drugs more available for use. Rather, the statute solely tends to stifle price competition and, therefore, of necessity, serves to deny information as to drug pricing to the needy.[2]

---

[2] Of particular interest in this regard is the Second Interim Report and Recommendations of the Task Force on Prescription Drugs issued August 30, 1968 by the United States Department of Health, Education and Welfare. It states at pages 51 through 53, "There is an obvious need for patients to be able to determine readily the prices charged by the various pharmacies in their community. This appears to be particularly important in the case of long-term maintenance drugs.

"The Task Force recognizes the difficulties in making such information easily available. Many patients are not told which drug has been prescribed for them—or are unable to decipher the physician's prescription. In many States, laws or regulations forbid pharmacies to advertise; even without such rules, however, advertising current prices on many thousands of different drugs and dosage forms would pose formidable practical problems. Physicians, especially those in large cities, are likely to be unaware of the different prices which may be set at different pharmacies.

"The Task Force also recognizes that the retail price of the prescription includes not only the cost of the ingredients, but also in some instances the availability of home delivery and 24-hour-a-day operations, as well as the professional services of the pharmacist—and that different pharmacists may wish to place different values on such services.

"It recognizes that many or most patients may wish to select a pharmacy more on the basis of convenient location than on the basis of price.

"Nevertheless, if the patient is to maintain the right to select a pharmacy, he also has a right to know the prices it charges and to compare these with other prices.

"The Task Force finds there is a need for medical associations, pharmacy associations and consumer groups, working together at the local level, to develop mechanisms whereby patients may obtain information on local prescription prices, especially for long-term maintenance drugs."

In my opinion, the legislature's exercise of the police power is, in this case, unreasonable and patently beyond the necessities of the case; it bears no real and substantial relation to the lower court's supposition that it is designed to protect the aberrant. Rather, it has the effect of indirectly restricting all price competition in this area.

For these reasons I would reverse the order of the lower court and dismiss the charges against appellant.