## Pennsylvania State Board of Pharmacy v. Pastor, Appellant.

Argued May 27, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*David N. Savitt*, with him *John Patrick Walsh*, for appellant.

*Victor L. Schwartz*, Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE ROBERTS, January 7, 1971:
Section 8(11) of the Pharmacy Act, Act of September 27, 1961, P. L. 1700, 63 P.S. §390-8(11), makes it unlawful for a pharmacist to advertise the prices of dangerous or narcotic drugs.[1] We are today called upon to determine whether this statute is constitutional.

---

[1] The terms "narcotic drug" and "dangerous drug" are defined in The Drug, Device and Cosmetic Act, Act of September 26, 1961, P. L. 1664, §2, 35 P.S. §780-2(g) and (h). We note that Section 2(h)(4) defines as "dangerous" all drugs which can be dispensed only with a physician's prescription. See note 13 infra.

The instant case arises as follows: In April of 1965 appellant's pharmacist license was revoked by the State Board of Pharmacy,[2] after it found that he had placed a newspaper advertisement listing the prices his pharmacy charged for certain drugs. The revocation was appealed to the Court of Common Pleas of Dauphin County, sitting as the Commonwealth Court, appellant asserting that the statute prohibiting advertising was unconstitutional. The court upheld the statute's constitutionality, but remanded the case to the Board for specific findings on whether the drugs advertised were, in fact, dangerous or narcotic drugs.[3] See 85 Dauph. 174 (1966). The Board held further hearings and did find that certain of the advertised drugs[4] were "dangerous drugs" within the meaning of the statute.[5] These

[2]Under Section 5(a)(6) of the Pharmacy Act, 63 P.S. §390-5(a)(6), the Board may revoke or suspend a pharmacist's license upon proof that the pharmacist violated any provision of the Pharmacy Act.

[3]The court also found that although the statute forbids advertising "dangerous drugs, narcotics or drugs", the word "drugs" could not be considered a separate category, "else practically every drugstore advertisement would be illegal". 85 Dauph. at 181. The propriety of this construction, however, is not before us, the parties not having raised it as error.

[4]The drugs advertised were: for the treatment of diabetes (orinase, insulin, diabinese); heart problems (nitroglycerin, coumadin, peritrate, digitalis, digitoxin, diuril, hydrodiuril); arthritis, rheumatism and/or gout (prednisone, prednisolone, butazolidin, sterazolidin, benemid, medrol); blood pressure (esidrix-K, naturetin c K, raudixin, serpasil); sedatives, tranquilizers, sleeping pills (doriden, equanil, meprobamate, miltown, phenobarbital, valium); anti-depressants (stelazine, elavil, tofranil); pain relievers (fiorinal, darvon); anti-appetite (preludin, tenuate, eskatrol); anti-histamine (benadryl); anti-fungicide (griseofulvin); anemia (trinsicon); oral contraceptive (ortho-novum); menopause (premarin); kidney and bladder infection (gantrisin); epilepsy (dilantin).

[5]The Board found that phenobarbital and preludin were "dangerous drugs" under Section 2(h)(1) and (2) of The Drug, Device and Cosmetic Act, 35 P.S. §780-2(h)(1) and (2), since they con-

findings were affirmed in part by the Court of Common Pleas of Dauphin County,[6] and the revocation was reduced to a six month suspension. See 88 Dauph. 273 (1967). An appeal to the Superior Court resulted in a per curiam affirmance without opinion, Judge HOFF-MAN filing a dissenting opinion setting forth his view that the statute is unconstitutional. See 213 Pa. Superior Ct. 227, 228-38, 247 A. 2d 651, 652-56 (1968). We granted allocatur.[7]

Our adjudication begins with an acknowledgment that the day has long passed when the Due Process Clause of the Fourteenth Amendment could be used to indiscriminately strike down state economic regulatory statutes. It is certainly clear that the "vague contours" of due process, see *Adkins v. Children's Hospital,* 261 U.S. 525, 567, 568, 43 S. Ct. 394, 405 (1923) (HOLMES, J., dissenting), cannot be employed to engulf a State's efforts to, for example, set minimum hours for work, see *Lochner v. New York,* 198 U.S. 45, 25 S. Ct. 539 (1905), or set minimum wages for children, see *Adkins v. Children's Hospital,* supra, or prohibit employment agencies from collecting fees from employees, see *Adams v. Tan-*

tained "any quantity of barbituric acid" or "any quantity of amphetamine". The Board also found benadryl, doriden, meprobamate, equanil, miltown, phenobarbital, preludin and valium to be "dangerous drugs" under Section 2(h)(4), since they are "limited under the Federal Act to use under the professional supervision of a practitioner licensed by law to administer such drug".

[6]The court held that insufficient evidence was produced by the Board to support its finding that Sections 2(h)(1) and (2) were violated. As to the eight drugs held to have violated Section 2(h) (4), the court sustained the Board's finding, noting that the Board's expert witness "did unequivocally testify that the drugs have toxic effects and a potentiality for harm and require the prescription of licensed physicians under Federal Law". 88 Dauph. at 278.

[7]An amicus curiae brief was filed on behalf of the States of Colorado, North Dakota and Virginia, and leave was allowed for an Assistant Attorney General from Colorado to participate in oral argument.

*ner;* 244 U.S. 590, 37 S. Ct. 662 (1917). In a long line of cases, see *Day-Brite Lighting v. Missouri,* 342 U.S. 421, 423; 72 S. Ct. 405, 407 (1952) (citing cases), the Supreme Court of the United States has "returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws". *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S. Ct. 1028, 1031 (1963). "Deference to the legislative judgment" is now the federal watchword, see *Daniel v. Family Security Life Insurance Co.,* 336 U.S. 220, 224 n. 4, 69 S. Ct. 550, 553 n. 4 (1949); *United States v. Carolene Products Co.,* 304 U.S. 144, 152, 58 S. Ct. 778, 783 (1938). "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 488, 75 S. Ct. 461, 464 (1955). See also *Adams v. Tanner,* 244 U.S. 590, 596, 599-600, 37 S. Ct. 662, 665, 666 (1917) (BRANDEIS, J., dissenting).

While this test may mean that in the federal courts the "due process barrier to substantive legislation as to economic matters has been in effect removed,"[8] the same cannot be said with respect to state courts and state constitutional law. This difference between federal and state constitutional law represents a sound development, one which takes into account the fact that "state courts may be in a better position to review local economic legislation than the Supreme Court. State Courts, since their precedents are not of national authority, may better adapt their decisions to local economic conditions and needs. . . . And where an industry is of basic importance to the economy of a state or

---

[8] Stern, The Problem of Yesteryear—Commerce and Due Process, 4 Vand. L. Rev. 446 (1951), quoted in Essays in Constitutional Law 155 (R. McCloskey, ed., 1957).

territory, extraordinary regulations may be necessary. and proper." Hetherington, State Economic Regulation and Substantive Due Process of Law, 53 Nw. U..L. Rev. 226, 250 (1958) (footnote omitted).

Thus Pennsylvania, like other state "economic laboratories", see *New State Ice Co. v. Liebmann,* 285 U.S. 262, 280, 311, 52 S. Ct. 371, 375, 387 (1932) (BRANDEIS, J., dissenting), has scrutinized regulatory legislation perhaps more closely than would the Supreme Court of the United States.[9] We have held unconstitutional, for example, an act regulating car rental agencies as a public utility, see *Hertz Drivurself Stations, Inc. v. Siggins,* 359 Pa. 25, 58 A. 2d 464 (1948), an act forbidding gasoline stations from displaying price signs in excess of a certain prescribed size, see *Gambone v. Commonwealth,* 375 Pa. 547, 101 A. 2d 634 (1954), an act forbidding the sale of carbonated beverages made with sucaryl, see *Cott Beverage Corp. v. Horst,* 380 Pa. 113, 110 A. 2d 405 (1955),[10] an act forbidding the sale of ice-milk milk shakes, see *Commonwealth ex rel. Woodside v. Sun Ray Drug Co.,* 383 Pa. 1, 116 A. 2d 833 (1955), and an act forbidding nonsigners from selling fair traded items below the price specified in price maintenance contracts, see *Olin Mathieson Chemical Corp. v. White Cross Stores, Inc.,* 414 Pa. 95, 199 A. 2d 266 (1964).

Through all these cases we have been guided by the proposition that "a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of

_____

[9]For a survey of state court decisions sustaining, and rejecting, state regulatory legislation, see Hetherington, State Economic Regulation and Substantive Due Process of Law, 53 Nw. U. L. Rev. 226, 229-48 (1958).

[10]We note that in *Cott* none of the parties contended that sucaryl, made with calcium cyclamate, was deleterious to health. See *Cott,* 380 Pa. at 117, 110 A. 2d at 407.

the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained." *Gambone v. Commonwealth,* 375 Pa. at 551, 101 A. 2d at 637. It is with this test, and the above principles, in mind that we now move to consider the constitutionality of the instant statute.

Regulating the advertising of retail drugs is by no means unique to Pennsylvania. The federal government, for example, has regulations pertaining to advertising prescription drugs, although there is no prohibition on advertising the prices of such drugs. See 21 C.F.R. 1.105. In addition, several states have statutes similar to Pennsylvania's, forbidding pharmacists from advertising the prices of prescription drugs.[11] Two court decisions have been reported sustaining such provisions: *Patterson Drug Co. v. Kingery,* 305 F. Supp. 821 (W.D. Va. 1969) (three-judge court), and *Supermarkets General Corporation v. Sills,* 93 N.J. Super. 326, 225 A. 2d 728 (1966); in one state the provision has been held unconstitutional: *Florida Board of Pharmacy v. Webb's City, Inc.,* 219 So. 2d 681 (Fla. 1969); *Stadnik v. Shell's City, Inc.,* 140 So. 2d 871 (Fla. 1962). Nor is the pharmaceutical profession the only one in which price advertising is forbidden. Optometrists, for example, are also forbidden from engaging in such advertising, see the Act of May 18, 1956, P. L. 1631, §2, 63 P.S. §237, and we have sustained this prohibition, see *Ullom v. Boehm,* 392 Pa. 643, 142 A. 2d 19 (1958).

The Commonwealth, and amici, urge that we uphold the instant prohibition.[12] The following reasons are

[11]See, e.g., Md. Code Ann. Art. 43, §266A(c)(iv); N. Y. Educ. Law §6804(1)(d); N. J. Stat. Ann. §45:14-12(c); Va. Code Ann. Sec. 54-524.35(4) (Supp. 1970).

[12]We note that the instant prohibition does not affect advertising directed to other than the "general public", i.e., to physicians. See Comment, Prescription Drug Pricing in California: An Analysis of Statutory Causes and Effects, 49 Cal. L. Rev. 340, 344-45 (1961).

given: (1) By prohibiting the advertisement of narcotics and dangerous drugs, we can help keep them out of the public eye, thus diminishing their use. (2) Price advertising, by encouraging consumers to "shop around", increases the possibility that an individual will no longer use only one pharmacy. Thus the pharmacist will no longer be able to "monitor" prescriptions to determine whether the consumer is taking antagonistic drugs. (3) Price advertising may encourage small retailers to buy unusually large quantities of drugs, so as to obtain a lesser price. As a result, drugs may stay on the pharmacist's shelf for an extended period of time during which they may deteriorate. Examining each reason in turn, however, we will find that none meets the test set out in *Gambone,* supra: Whether the means employed—the prohibition of retail price advertising of prescription drugs—bears a "substantial relation to the objects sought to be obtained."

The first reason—diminishing the demand for, and use of, dangerous drugs—is the reason primarily relied upon by the Commonwealth, as well as the trial court: "[T]he promotion and advertising of dangerous drugs and narcotics would certainly to a degree titillate an aberrant person and create an atmosphere of easy availableness". *State Board v. Pastor,* 85 Daup. 174, 179 (1966). No one can quarrel with this goal, but closer examination does not demonstrate that the advertising prohibition bears a substantial relation to it.

The sale of "dangerous drugs" is a closely supervised business. All dangerous drugs must be dispensed, if at all, by a prescription,[13] and a prescription, by

---

[13]The definition of dangerous drugs in The Drug, Device and Cosmetic Act, 35 P.S. §780-2(h) makes no reference to prescription. Subsections (h)(1) and (h)(2) merely list a series of drugs by name, and Subsection (h)(3) provides that additional drugs may be designated as "dangerous" after certain findings by the

definition, may only be issued by a duly licensed medical practitioner, see the Pharmacy Act, 63 P.S. §390-2 (8), (9). Thus it is the physician, not the consumer, who determines what "dangerous drugs" may be purchased. Further, the sale of a dangerous drug without a prescription is a prohibited act, see The Drug, Device and Cosmetic Act, 35 P.S. §780-4(x), which can subject the pharmacist to criminal penalties, see 35 P.S. §780-20, as well as the loss of his pharmacy license, see the Pharmacy Act, 63 P.S. §390-5.

Therefore, to urge that allowing price advertisements of prescription drugs would increase the use of such drugs, one must assume either (a) that patients are able to pressure doctors into prescribing drugs for

---

Secretary of Health and upon recommendation of the Pennsylvania Drug, Device and Cosmetic Board.

However, 35 P.S. §780-4(x) prohibits "[t]he sale at retail or dispensing of *any dangerous drug* to any person, except to one authorized by law to sell, dispense, prescribe or possess such drugs, *unless upon the written or oral prescription of a person licensed by law to prescribe* such drug . . ." (Emphasis added.)

35 P.S. §780-2(h)(4) also defines as "dangerous" all drugs which may be dispensed only with a physician's prescription. See 21 U.S.C. §353(b)(1)(B): "A drug intended for use by man which . . . because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drugs . . . shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drugs, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber. . . ." Section 353(b)(4) provides that such drugs will bear the legend "Caution: Federal law prohibits dispensing without a prescription".

Further examination of 21 U.S.C. §§353(b)(1)(A)(B) and 352(d) reveals that drugs in the first and third categories of the statutory definition of "dangerous drugs", 35 P.S. §780-2, may, as a matter of federal law, be dispensed only by prescription.

them, or (b) that pharmacists are willing to risk selling such drugs without a prescription. We think neither assumption is valid. As the Supreme Court of Florida stated in a case striking down as unconstitutional a rule prohibiting price advertising of prescription drugs: "The rule proceeds on the notion that the advertisement of a prescription drug will subject the physicians to some sort of irresistible pressures that will force them to prescribe drugs for their patients simply on the basis of patient demand and without regard to the physical well-being of the patient. This concept disregards completely the professional and ethical integrity of the medical profession in prescribing remedies for patients. Furthermore, it actually suggests the probability of unethical conduct." *Stadnick v. Shell's City, Inc.*, 140 So. 2d 871, 875 (Fla. 1962).[14]

It is this unique purchasing structure, along with the high degree of regulation, which serves to distinguish the retail sale of prescription drugs from the sale of eyeglasses, and the instant case from *Ullom v. Boehm*, supra, which upheld the prohibition on advertising the price of eyeglasses. Eyeglasses, unlike prescription drugs, may be purchased on a direct demand by the consumer, and may be sold by the retailer on his own authority. Further, no contention was made in *Ullom* that advertising the price of eyeglasses would stimulate an unhealthy demand. Rather, it was urged, and accepted, that price advertising might lead a dealer to "sell to the public, eye-damaging glasses in order to adhere to an arbitrarily established reduced budget". *Ullom*, 392 Pa. at 649, 142 A. 2d at 21-22. In the instant case no one contends that price advertising would lead a pharmacist to sell damaging drugs, for the pharmacist

---

[14]In *Florida Board of Pharmacy v. Webb's City, Inc.*, 219 So. 2d 681 (Fla. 1969), the Florida Supreme Court, on the authority of *Stadnik*, held that a statute forbidding such advertising was likewise unconstitutional.

is not permitted to deviate from the prescription given him. See the Pharmacy Act, 63 P.S. §390-5(8). Indeed, as Judge HOFFMAN noted in his dissent, the lack of comprehensive regulation for selling eyeglasses helps justify "finding constitutional a statutory scheme which imposes some restraints and protections where none otherwise existed". 213 Pa. Superior Ct. at 236, 247 A. 2d at 656 (footnote omitted).

We must therefore conclude that because of the highly regulated structure of the pharmaceutical profession, and the fact that the consumer cannot choose his purchases, it would appear most unlikely that advertising the prices of retail prescription drugs would, or could, have any impact on the demand or consumption of such drugs. Hence we must find that the first reason advanced cannot support the prohibition.

The second reason advanced to support the prohibition is that price advertising may encourage price shopping, with a resultant adverse impact on the pharmacist's "monitoring function". This is a reason which has been accepted by the courts which have upheld statutes forbidding price advertising of prescription drugs. In *Supermarket General Corp. v. Sills*, 93 N.J. Super. 326, 341, 225 A. 2d 728, 737 (1966), it was stated that "there may be infrequent instances where a pharmacist does 'monitor' the prescription for the purpose of possibly detecting the prescription of an antagonistic drug. Infrequent as such occasions may be, they may justify the enactment. . . ." And in *Patterson Drug Co. v. Kingery*, 305 F. Supp. 821, 824 (W.D. Va. 1969), the court noted that "[a]lthough monitoring is not completely effective because of the mobility of customers and the availability of nonprescription drugs which may be antagonistic, it is a benefit to the public".

We do not believe, however, that this asserted reason is sufficient to sustain the prohibition. The Com-

monwealth has produced no evidence to indicate the extent, if any, to which pharmacists monitor prescriptions, and even the courts which have accepted this rationale have admitted that monitoring is "infrequent" and "not completely effective". Further, it is primarily the physician's duty to be certain that he is not prescribing drugs antagonistic to those already being taken by his patient. Indeed, it would appear that if the Legislature was in fact concerned about the prescribing of antagonistic drugs, it would have chosen a route more direct than simply prohibiting the advertising of their prices. Cf. *Gambone v. Commonwealth*, 375 Pa. at 552, 101 A. 2d at 637; Struve, The Less-Restrictive Alternative Principle and Economic Due Process, 80 Harv. L. Rev. 1463, 1472 (1967).

Nor can it be said that prohibiting advertising of drug prices bears a substantial relation to the third goal asserted—prevention of deterioration of drugs. As in the case of the monitoring function, the means chosen are so far removed from the goal suggested that one must strain to find the relation. In addition, we note that this problem *has* been attacked in a more direct fashion. A drug will be deemed "adulterated" if it falls below the requisite standard of strength, quality and purity, see The Drug, Device and Cosmetic Act, 35 P.S. §780-13(b). Sale of such an adulterated drug is prohibited; see 35 P.S. §780-4(a), and may subject the pharmacist to criminal liability: see 35 P.S. §780-20, as well as the loss of his license, see the Pharmacy Act, 63 P.S. §390-5. With such stringent provisions, the additional prohibition on price advertising would certainly appear to be "patently beyond the necessities of the case". *Gambone,* supra.

We thus find that the prohibition in question bears no substantial relation to any of the objects which the Commonwealth, and amici, assert were sought to be obtained. Even so, we would still hesitate to see the

statute "aborted by judicial fiat"[15] were it not for its ill effects: the dampening of price competition in the retail sale of prescription drugs.[16] Lack of information on prices, occasioned in part by the instant prohibition, results in consumers having little idea as to the proper prices for prescription drugs, thus running a substantial chance of paying more for medicines than is necessary. For example, a recent survey conducted in New York City by Consumers Union indicates that the price for the same thirty capsules of a well known antibiotic may range from $.79 to $7.45. Part of the reason assigned for this large discrepancy was the lack of advertising, and Consumers Union concluded: "All in all, here is a case where honest-to-goodness price advertising is much needed." "What's the price of an Rx Drug?", 35 Consumer Reports 279 (1970). See Comment, Prescription Drug Pricing in California: An Analysis of Statutory Causes and Effects, 49 Cal. L. Rev. 340, 347, 351 (1961) (recommending greater price advertising of retail prescription drugs).

The need for such information has also recently been emphasized in the Second Interim Report and Recommendations of the Task Force on Prescription Drugs of the United States Department of Health, Education, and Welfare, at 20-21 (August 30, 1968) : "There is an obvious need for patients to be able to determine readily the prices charged by the various pharmacies

---

[15]*American Federation of Labor v. American Sash & Door Co.*, 335 U.S. 538, 542, 553, 69 S. Ct. 258, 260, 265 (1949) (FRANKFURTER, J., concurring).

[16]This is not to say, nor do any of the parties contend, that the goal of this statute is to regulate the retail prices of prescription drugs. Compare *Olin Mathieson Chemical Corp. v. White Cross Stores, Inc.*, 414 Pa. 95, 199 A. 2d 266 (1964). See also *Commonwealth ex rel. Woodside v. Sun Ray Drug Co.*, 383 Pa. 1, 17, 116 A. 2d 833, 841 (1955) : " 'The stifling of competition through an exercise of the State's police power is never justifiable except that it be done, and actually be, in the public interest. . . .' "

in their community. This appears to be particularly important in the case of long-term maintenance drugs. The task force recognizes the difficulties in making such information easily available. . . . Nevertheless, if the patient is to maintain the right to select a pharmacy, he also has a right to know the prices it charges and to compare these with other prices. The task force finds there is a need for medical associations, pharmacy associations, and consumer groups, working together at the local level, to develop mechanisms whereby patients may obtain information on local prescription prices, especially for long-term maintenance drugs."[17] The poor, and particularly the elderly, cannot afford this lack of information.

For all the foregoing reasons, we are drawn to the conclusion that the statute is unconstitutional insofar as it prohibits the advertising of "dangerous drugs".

The orders of the Superior Court and the Court of Common Pleas of Dauphin County are reversed, and the citation is dismissed.

Mr. Justice COHEN took no part in the decision of this case.

_____

DISSENTING OPINION BY MR. JUSTICE JONES:

At the outset I should like to state my understanding of the thrust of the Majority Opinion. Today the majority finds violative of due process *only* that portion of Section 8(11) of the Pharmacy Act, Act of September 27, 1961, P. L. 1700, 63 P.S. §390-8(11) prohibiting the advertisement of "dangerous drugs".

_____

[17]The Task Force also noted (at 23) : "The present patchwork of State pharmacy laws, regulations, and codes of ethics obviously reflects attempts to cope with a variety of pharmacy problems on a piecemeal basis. Whether they are aimed at the protection of the public health or the prevention of competition—fair or unfair—is not clear in all cases".

Owing to the unique statutory definitions chosen by the General Assembly and the interaction of state and federal law, the majority is able to equate drugs legitimately available only on prescription with "dangerous drugs." Henceforth, the pharmacies in the Commonwealth will be permitted to advertise prescription drugs and *not* all those drugs loosely termed "dangerous drugs". Though only prescription drugs may be advertised, I must nonetheless dissent.

The cornerstone of the Majority Opinion is the "unique purchasing structure" of the prescription drug industry whereby such drugs are available only upon a written or oral prescription from a duly licensed medical practitioner and filled by a licensed pharmacist. Thus, the majority is able to erect the required prescription as a bulwark against drug abuse; to do otherwise, the majority concludes, would impugn the professional integrity of either doctors or pharmacists. It may be true that the incidence of *legitimate* drug taking will not be increased but one must pause to consider the effect of the majority's decision on the incidence of *illegitimate* drug consumption.

In an increasingly drug-oriented society it cannot be gainsaid that such advertising might very well "titillate an aberrant person". Considering the thesis of many popular writers that advertising agencies can sell any product, including politicians, could not this prescription drug advertising have the side effect, albeit unintentional, of popularizing the illegal use of drugs? The blatant, multi-media advertising of prescription drugs that can be anticipated may very well have the effect of placing society's stamp of approval on any and all drug usage. While it may be argued, owing to the already widespread use of narcotics, that my position would add but one more cup of water to the sea, such advertising may also be the straw to break society's back. Thus, it is my belief that the majority's

analysis does not fully explore all the possible ramifications of this decision.

I further disagree with the majority's dismissal of this Court's rationale in *Ullom v. Boehm*, 392 Pa. 643, 142 A. 2d 19 (1958), because of the "unique purchasing structure" of prescription drugs. In distinguishing *Ullom*, the majority pays no heed to the spirit or essence of the *Ullom* opinion insofar as that case impugned the profession of optometry by recognizing the legislative determination to remove "from dealers the temptation to sell to the public, eye-damaging glasses in order to adhere to an arbitrarily established reduced budget". 392 Pa. at 648-49, 142 A. 2d at 21. For some unarticulated reason the majority does not choose to demean pharmacists whereas this Court has already impugned optometrists. Just as an optometrist may sell "eye-damaging glasses in order to adhere to an arbitrarily established reduced budget", so may a pharmacist sell prescription drugs without a prescription in order that his volume of drug sales at reduced prices will cover his costs.

For these reasons, I dissent and would affirm the revocation.