**[J-71-2019] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| SARA LADD, SAMANTHA HARRIS, AND POCONO MOUNTAIN VACATION PROPERTIES, LLC, | : | No. 33 MAP 2018 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 321 |
| Appellants | : | MD 2017 dated June 4, 2018 |
| | : | sustaining in part and overruling in |
| | : | part the preliminary objections and |
| v. | : | dismissing with prejudice the |
| | : | Petition for Review. |
| | : | |
| REAL ESTATE COMMISSION OF THE | : | ARGUED:  September 11, 2019 |
| COMMONWEALTH OF PENNSYLVANIA | : | |
| AND DEPARTMENT OF STATE (BUREAU | : | |
| OF PROFESSIONAL AND | : | |
| OCCUPATIONAL AFFAIRS) OF THE | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| | : | |
| Appellees | : | |

**DISSENTING OPINION**


**JUSTICE WECHT**                                      **DECIDED:  May 19, 2020**

The General Assembly did not violate Article I, Section 1 of the Pennsylvania Constitution[1] when it classified short-term vacation-property managers like Appellant Ladd as real estate brokers for purposes of the Real Estate Licensing and Registration Act.  In concluding otherwise, the learned Majority further entrenches the deeply flawed "heightened rational basis" test that this Court manufactured in *Gambone v. Commonwealth*, 101 A.2d 634, 637 (Pa. 1954).  Because I cannot endorse a

---

[1]       PA. CONST. art. I, § 1 ("All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.").

constitutional standard that encourages courts—under the facade of substantive due process—to second-guess the wisdom, need, or appropriateness of otherwise valid legislation, I respectfully dissent.

As I have explained in the past, this Court's substantive due process jurisprudence is an historical relic of an era when the United States Supreme Court insisted that the Constitution forbids lawmakers from interfering with "economic liberty" and the "freedom of contract." *See Shoul v. Pa. Dep't of Transp., Bureau of Driver Licensing*, 173 A.3d 669, 689 (Pa. 2017) (Wecht, J., concurring) (explaining that early twentieth century due process decisions arose "in an era during which the Supreme Court of the United States, under the guise of protecting economic rights, actively struck down state laws because it disagreed with the economic theory or opinion of the legislatures that passed those statutes"). To understand *Gambone*'s shortcomings, one first must understand the United States Supreme Court's now-infamous decision in *Lochner v. New York*, 198 U.S. 45 (1905), where the Court struck down a New York law prohibiting bakery employees from working more than ten hours per day or sixty hours per week. Those restrictions, the Court held, violated the Fourteenth Amendment's[2] due process clause because they were an "unreasonable, unnecessary and arbitrary interference with the right of the individual" to contract freely. *Id.* at 56.

*Lochner* jumpstarted an era of judicial overreach. For many years, and under the pretext of protecting "economic liberty" and "freedom of contract," the Supreme Court routinely struck down laws that a majority of the Court deemed unwise or improvident. *See*, *e.g.*, *Adkins v. Children's Hosp.*, 261 U.S. 525 (1923) (striking down minimum wage

---

[2]     *See* U.S. CONST. amend. XIV ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

legislation) (overruled by *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937)); *Coppage v. Kansas*, 241, 236 U.S. 1 (1915) (striking down a law that prohibited "yellow dog" contracts, in which employees agreed not to join a labor union) (overruled by *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177 (1941)). Most now recognize that those decisions had nothing to do with the text or history of the Constitution; they were based upon nothing more than the policy preferences of the justices who signed on to them. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 591-92 (2011) (Breyer, J., dissenting) ("[In the Lochner] era . . . judges scrutinized legislation for its interference with economic liberty. History shows that the power was much abused and resulted in the constitutionalization of economic theories preferred by individual jurists."); *accord* Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States, U.S. GOVERNMENT PRINTING OFFICE, at 162, *available at* https://www.govinfo.gov/content/pkg/gpo-chrg-roberts/pdf/gpo-chrg-roberts.pdf ("You go to a case like the *Lochner* case. You can read that opinion today and it's quite clear that they're not interpreting the law, they're making the law. . . . You can look at that and see that they are substituting their judgment on a policy matter for what the legislature had said.").

Even in the moment, many strongly objected to the Supreme Court's judicial intrusion into the realm of legislative value judgments. Within the Court, Justices Holmes and Brandeis were the most vocal critics of this judicial policymaking. In *Adkins*, for example, Justice Holmes emphasized that "[t]he criterion of constitutionality is not whether we believe the law to be for the public good." *Adkins*, 261 U.S. at 570 (Holmes, J., dissenting). And when the Court struck down a New York law limiting the markup that theater-ticket resellers could charge, Justice Holmes stated:

> I think the proper course is to recognize that a state Legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious

meaning by reading into them conceptions of public policy that the particular Court may happen to entertain.

*Tyson & Bro.-United Theatre Ticket Offices v. Banton*, 273 U.S. 418, 446 (1927) (Holmes, J., dissenting).

Eventually, Justice Holmes' view prevailed. Although the decision in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), where the Supreme Court upheld a state minimum wage law, is commonly cited as the end of the so-called *Lochner* era, it was not until 1955—the year after *Gambone* was decided—that the Supreme Court announced the death of *Lochner*. In *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483 (1955), the High Court explained that "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Id.* at 488. The Court went on to clarify that "[a] law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* at 487-88.

In Pennsylvania, however, our own *Lochner* era was just beginning, even as the federal courts moved toward a more deferential "rational relationship" standard.[3] Our decision in *Gambone*, for example, considered the constitutionality of a 1951 law that prohibited the display of gasoline price signs larger than twelve square inches. *Gambone*,

---

[3]     Surprisingly, this Court was not alone in its failure to accept that the *Lochner* era had ended. Though most state courts (unlike this Court) eventually stopped subscribing to *Lochner*'s economic liberty rationale, many continued to do so "even after the Supreme Court made it crystal clear that this would constitute an incorrect application of the Due Process Clause of the Fourteenth Amendment." Anthony B. Sanders, *The "New Judicial Federalism" Before Its Time: A Comprehensive Review of Economic Substantive Due Process Under State Constitutional Law Since 1940 and the Reasons for Its Recent Decline*, 55 AM. U. L. REV. 457, 475 (2005); *see id.* at 478 (explaining that "in the 1940s, 1950s, and 1960s the highest courts of appeal in almost every state struck down state statutes and local ordinances on economic substantive due process grounds").

101 A.2d at 636.  Citing a litany of now-overruled Supreme Court decisions, this Court asserted that:

> a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained.  Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.  The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts.

*Id.* at 637 (footnote omitted).

Applying this test, the Court flatly declared that prohibiting gasoline dealers from posting "price signs in excess of a certain prescribed size is wholly unreasonable and arbitrary and bears no rational relation to public health, safety, morals, or welfare."  *Id.*  Yet there can be no serious doubt that the *Gambone* Court was mistaken about the proper due process inquiry.  Indeed, the Court concluded—after announcing that "unreasonable" and "unduly oppressive" laws are unconstitutional—that the statute in question violated both Article I of the Pennsylvania Constitution and the Fourteenth Amendment to the United States Constitution.[4]  In other words, the Court in *Gambone* failed to recognize that federal due process jurisprudence was undergoing a dramatic transformation.  It believed, incorrectly, that cases decided during the peak of the *Lochner* era remained good law.  *See Gambone*, 101 A.2d at 637 n.1 (citing the now-overruled decisions in

---

[4]     *Gambone*, 101 A.2d at 638 ("We hold that the provision of the statute forbidding price signs in excess of the size therein prescribed violates Article I, sections 1 and 9 of the Constitution of Pennsylvania, [] and also the 14th Amendment to the Constitution of the United States, and is therefore null and void.").

*Louis K. Liggett Co. v. Baldridge*, 278 U.S. 105 (1928), *Weaver v. Palmer Bros. Co.*, 270 U.S. 402 (1926), and *Jay Burns Baking Co. v. Bryan*, 264 U.S. 504 (1924)).

Despite its numerous failings, *Gambone* quickly embedded itself into our due process jurisprudence.[5] Post-*Gambone*, this Court—much like the Supreme Court of the *Lochner* era—enthusiastically invoked its newfound power to shape public policy whenever the opportunity arose. To name just a few examples, we struck down a law prohibiting the sale of carbonated beverages made with a carcinogenic sweetener, *Cott Beverage Corp. v. Horst*, 110 A.2d 405 (Pa. 1955), a law banning the sale of low butterfat milkshakes, *Com. ex rel. Woodside v. Sun Ray Drug Co.*, 116 A.2d 833 (Pa. 1955), a local ordinance prohibiting the dumping of garbage collected from outside of the township, *Lutz v. Armour*, 151 A.2d 108 (Pa. 1959), and a law that prohibited pharmacists from advertising the prices of dangerous narcotic drugs, *Pa. State Bd. of Pharmacy v. Pastor*, 272 A.2d 487 (Pa. 1971). *See also Simco Sales Serv. of Pa., Inc. v. Lower Merion Twp. Bd. of Comm'rs*, 394 A.2d 642 (Pa. Cmwlth. 1978) (striking down an ordinance banning ice cream trucks); *Fantastic Plastic, Inc. v. City of Pittsburgh*, 377 A.2d 1051 (Pa. Cmwlth. 1977) (striking down a city ordinance prohibiting the operation of "bottle clubs" where patrons could bring their own alcohol to consume while on the premises).

Those decisions, each of which relied upon *Gambone*, purported to apply the ordinary rational basis test. Yet the plain language of *Gambone* departs significantly from the teachings of modern due process cases. *See Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) (explaining that a law comports with substantive due process if it is "rationally related to legitimate government interests"). We finally confronted this discrepancy *in Nixon v. Commonwealth*, 839 A.2d 277 (Pa. 2003), where we insisted that,

---

[5] Given the opinion's glaring legal errors and overall lack of depth (the decision spans only three pages in the official reporter), it is truly remarkable that *Gambone* went on to become what is now considered to be a foundational due process decision.

"[a]lthough the due process guarantees provided by the Pennsylvania Constitution are substantially coextensive with those provided by the Fourteenth Amendment, a more restrictive rational basis test is applied under [the Pennsylvania] Constitution." *Id.*

But why? There is absolutely nothing in the text or history of our Constitution that sanctions this judicial second-guessing of legislation.[6] Say what you will about the *Lochner* decision, but the Supreme Court at least *claimed* that it was protecting a constitutional right: an ill-defined "freedom of contract." *Lochner*, 198 U.S. at 60. *Gambone* and its progeny shed even that dubious pretense. Under our precedent, Pennsylvania courts are free to question the necessity and reasonableness of all laws— or any "exercise of the police power," as the *Gambone* Court put it—under the guise of substantive due process. *Gambone*, 101 A.2d at 636.

Worse still, the *Gambone* standard—rooted in conceptions of reasonableness and necessity—is so nebulous that it cannot possibly be applied consistently throughout different cases and among different courts. *See Adkins*, 261 U.S. at 568 (Holmes, J., dissenting) (noting the "vague contours" of *Lochner* era due process). To state the

---

[6] The closest that this Court has come to offering a justification for the heightened rational basis standard was in *Pennsylvania State Board of Pharmacy*, where—borrowing from a law review article—we stated that:

> Th[e] difference between federal and state constitutional law represents a sound development, one which takes into account the fact that "state courts may be in a better position to review local economic legislation than the Supreme Court. State courts, since their precedents are not of national authority, may better adapt their decisions to local economic conditions and needs. . . . And where an industry is of basic importance to the economy of a state or territory, extraordinary regulations may be necessary and proper."

*Pa. State Bd. of Pharmacy*, 272 A.2d at 490 (quoting John A.C. Hetherington, *State Economic Regulation & Substantive Due Process of Law*, 53 Nw. U. L. Rev. 226, 250 (1958-1959)). It is true enough, I suppose, that state courts are in a better position than the United States Supreme Court to weigh in on issues of local concern. But that alone does not explain why ordinary conceptions of due process empower *any* courts, state or federal, to enjoin laws that they deem "unreasonable."

obvious, reasonableness is very much in the eye of the beholder. Thus, as I have explained in the past, the *Gambone* standard:

> validates and encourages judicial overstepping, allowing courts to usurp the legislative role and to strike down laws merely because they are imperfect, unwise, or under-inclusive. Surely, some very large proportion of legislative work could fall within one or more of these categories. But republican democracy is a messy business. It is time to cease adherence to the outdated and overbroad language of *Gambone* in applying the rational basis test in Pennsylvania.

*Shoul*, 173 A.3d at 692-93 (Wecht, J., concurring)[7]; *see Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("The doctrine that prevailed in *Lochner* [era] cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.").

There is simply no conceivable justification for *Gambone*'s "heightened rational basis" standard. In the due process arena, a law that does not infringe upon fundamental rights withstands constitutional scrutiny so long as it is rationally related to some legitimate government interest. *Commonwealth v. Burnsworth*, 669 A.2d 883, 889 (Pa. 1995) ("To [perform the rational basis analysis], we have set forth a two[-]step approach. First, we must determine whether the challenged statute is designed to further a legitimate state interest or public value. If it is, we must then determine whether the statute is reasonably related to accomplishing the articulated state interest." (citations omitted)).

---

[7] *See also* Jennifer Senior*, In Conversation: Antonin Scalia*, NEW YORK MAGAZINE (Oct. 4, 2013), http://nymag.com/news/features/antonin-scalia-2013-10 ("A lot of stuff that's stupid is not unconstitutional. I gave a talk once where I said they ought to pass out to all federal judges a stamp, and the stamp says—Whack! [Pounds his fist.]—STUPID BUT CONSTITUTIONAL. Whack! [Pounds again.] STUPID BUT CONSTITUTIONAL! Whack! STUPID BUT CONSTITUTIONAL. [Laughs.] And then somebody sent me one.").

That brings us to this appeal. The Appellant here, Sara Ladd, is a New Jersey resident who owns two vacation properties on Arrowhead Lake in the Pocono Mountains. Since 2009, Ladd has used home sharing services like Airbnb to market her vacation properties to prospective renters. Ladd's friends and neighbors noticed that she was generating rental income using these services and they asked her to help them do the same. Ladd, who had been laid off from her job right around this time, agreed. She formed Pocono Mountain Vacation Properties, LLC to provide property management services to her friends and neighbors on a part time basis.[8]

Ladd eventually learned that she was violating Pennsylvania law when, in 2017, an investigator from the Department of State's Bureau of Professional and Occupational Affairs (the "Bureau") informed her that that she was being investigated for practicing real estate without a license in violation of the Real Estate Licensing and Registration Act ("RELRA").[9] *See* 63 P.S. §§ 455.101, *et seq.* If she wanted to continue operating her property management business, Ladd would need to become a licensed real estate broker, meaning that she would have to complete hundreds of hours of coursework, pass an exam, work as a real estate salesperson, and maintain a brick-and-mortar office within the Commonwealth. *See* Majority Opinion at 3-4 (detailing the RELRA's extensive broker licensing conditions). Unwilling to meet those requirements, Ladd shut down her business and filed a declaratory judgment action in Commonwealth Court against the

---

[8]     Ladd structured her business such that she would first sign an agreement with the property owners for her services as a vacation property manager. After determining the property owners' intended rental calendar, Ladd would then list the properties on the internet and handle all inquiries from prospective renters. To make a reservation, renters signed a rental agreement directly with the property owner. At the end of the process, Ladd handled all billing (including returning security deposits and remitting rents to her clients) and ensured that the property was cleaned between renters.

[9]     At issue here is the Act's definition of a "broker," which includes "[a]ny person who, for another and for a fee, commission or other valuable consideration . . . undertakes to promote the sale, exchange, purchase or rental of real estate." 63 P.S. § 455.201(5).

Bureau and the Pennsylvania Real Estate Commission seeking a declaration that the RELRA's broker licensing requirements, as applied to short-term vacation property managers, violate Article I, Section 1 of the Pennsylvania Constitution.

In a unanimous decision, the Commonwealth Court dismissed Ladd's petition for review with prejudice, finding that she failed to present a claim upon which relief could be granted. *Ladd v. Real Estate Comm'n of Pa.*, 187 A.3d 1070, 1078 (Pa. Cmwlth. 2018). Specifically, the Commonwealth Court emphasized that the primary purpose of the RELRA is "to protect buyers and sellers of real estate . . . from abuse by persons engaged in the business," which is especially important given that real estate is often "the most expensive item many persons ever buy or sell." *Id.* at 1077 (internal citations omitted). The court recognized that many professions require licenses "to ensure competence of professionals in given fields," and noted that Ladd's proposed Constitutional interpretation "would effectively upend the legitimacy of" occupational licensing requirements and expose the public to the risk of hiring unqualified professionals. *Id.* at 1078.

The Commonwealth Court acknowledged that the RELRA's licensing requirements appeared onerous as applied to Ladd given the small volume of her practice. Nevertheless, the court observed that no Pennsylvania court has found professional license requirements to be unconstitutional simply because some individuals would prefer to practice the profession in a more limited fashion. In this regard, the court explained that Article I, Section 1 "does not require the General Assembly to establish a tiered system for every profession that it regulates in order to account for different volumes of work performed." *Id.* at 1078. Thus, the court concluded that the RELRA "merely establishes the prerequisites to engaging in the practice of real estate" and therefore does not violate due process. *Id.* at 1079.

In my view, the Commonwealth Court correctly rejected Ladd's claim that the Constitution—somewhere within its secret repository of unenumerated rights— guarantees her the freedom to operate as an unlicensed real estate broker. As explained above, the only constitutionally relevant question is whether the RELRA's broker licensing requirements are rationally related to a legitimate government interest. I have little doubt that they are. As the Commonwealth Court noted, the RELRA's licensing scheme was designed to protect buyers, sellers, and renters of real estate from unqualified or unethical businesspeople. *Ladd*, 187 A.3d at 1077-78 (quoting *Kalins v. State Real Estate Comm'n*, 500 A.2d 200, 203 (Pa. Cmwlth. 1985)). One rational (*i.e.*, logical) way to protect the public is to ensure that all aspiring brokers complete specific courses, pass exams, and work under the tutelage of an experienced broker. Whether that is the best way to ensure competency in the real estate profession, or whether a less burdensome scheme would have sufficed, is not a question for this or any other court. *See Am. Fed'n of Labor v. Am. Sash & Door Co.*, 335 U.S. 538, 542 (1949) ("[T]he existence of evils against which the law should afford protection and the relative need of different groups for that protection 'is a matter for the legislative judgment.'" (quoting *W. Coast Hotel Co.*, 300 U.S. at 400)).

This case really is that simple. Nonetheless, I feel compelled to point out the flaws in the Majority's heightened-rational-basis analysis, even though that standard should not apply. First, the Majority suggests that the RELRA's educational requirements are oppressive given that, under Ladd's "unique business model," much of the coursework that she would need to complete to obtain a broker's license is unrelated to the services that she seeks to provide her clients. Majority Opinion at 28. So what? That is like saying licensing requirements for dentists are unconstitutional as applied to practitioners who only intend to extract teeth. Or that this Court's rules governing admission to the legal

profession are unconstitutional as applied to those who seek to represent clients only in traffic court. The fact that Ladd does not intend to provide all, or even most, of the services that real estate brokers typically offer has nothing to do with the RELRA's licensing regime; it is the result of her own choice. Despite the Majority's suggestion to the contrary, no one has a constitutional right to a custom-made licensing statute that perfectly aligns with their own individual career ambitions.[10]

Second, the Majority finds it significant that Ladd's "business model" would not be sustainable if she were forced to comply with the RELRA's licensing regime, since the costs of complying with the law would increase the prices that she charges her clients. Majority Opinion at 30. That fact is not significant at all. The mistaken belief underlying the Majority's argument is that there *must* be a financially viable path for semi-retired individuals to enter the real estate profession part-time while providing only limited services. Maybe there isn't. It is entirely possible—likely, even—that the side business Ladd envisions would not be economically practicable given Pennsylvania's broker licensing requirements, just as it likely would not be profitable for a sixty-five-year-old to attend law school and pass the bar exam in order to draft wills for friends and neighbors on a part-time basis. *See Nebbia v. People of New York*, 291 U.S. 502, 527-28 (1934) ("The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned.").

---

[10]    To the extent that there is value, from a policy perspective, in allowing property managers like Ladd to act outside of the RELRA's traditional broker-salesperson framework, it is for the General Assembly, not this Court, to effectuate that change. It should come as no surprise to anyone that social and economic changes brought about by new technology, like home sharing, ride sharing, and telemedicine applications, often necessitate amendment of existing statutory and regulatory schemes.

Finally, the Majority contends that there is a less restrictive alternative to regulating vacation-property managers under the RELRA, since Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") would still prevent those workers from engaging in "unfair methods of competition" and "unfair or deceptive acts or practices." Majority Opinion at 31; *see* 73 P.S. § 201-2(4) (prohibiting certain kinds of fraudulent and deceptive conduct that creates a likelihood of consumer confusion or of misunderstanding). There are three main problems with this reasoning. First, the same argument could be made for any professional licensing statute, since the UTPCPL is not limited in its application to any one field. *Id.* § 201-2(4). Second, the General Assembly (even under the misguided "heightened rational basis" test) need not select the least restrictive alternative to accomplish its legislative goals.[11] Finally, it would be perfectly sensible for the legislature to favor licensing requirements that could prevent consumers from being ripped off by unsavory real-estate practitioners in the first place, rather than simply giving them a private right of action (against potentially judgment proof defendants) after some harm arises.

Put simply, the Majority opinion resembles a public policy whitepaper more than a judicial decision; it weighs the pros and cons of regulating vacation-property managers in the same manner as real estate brokers, *see* Majority Opinion at 29-32, and balances the need to protect the public with a desire to limit "oppressive" barriers to entering the profession, *id.* at 32. In other words, the Majority is legislating.

---

[11] *See Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 947 (Pa. 2004) ("Whether a statute is wise or whether it is the best means to achieve the desired result are matters left to the legislature, and not the courts. Moreover, the General Assembly is presumed to have investigated the question and ascertained what is best for the good of the profession and the good of the people."); *accord Ullom v. Boehm*, 142 A.2d 19, 21 (Pa. 1958) (upholding a law prohibiting opticians from advertising the prices of their products).

Though nothing in the Constitution envisions a system of government by judges, that is exactly what this Court's due process jurisprudence gives us. *Gambone* empowers jurists to sit as junior-varsity legislators, questioning the wisdom of laws regulating everything from ice-cream trucks to vacation rentals to gas-pump signage. The longer we wait to overrule *Gambone*, the more we deprive the citizens of this Commonwealth of the right to govern themselves. Because I cannot, in good conscience, join a decision applying *Gambone*'s "heightened rational basis" test, I must respectfully dissent.